J. E. DECKER et al., Appellants, v. B. J. DIEMER et al.

In Banc, June 21, 1910.

1. **COURTHOUSE FUND: Unpaid Fee Bills.** Where it was not shown that there was no money in the appropriation fund out of which fee bills in criminal cases for prior years could have been paid, it was not error to exclude those bills from the evidence offered to establish unlawful conduct on the part of the county court in setting apart a balance in the various county funds, after all debts of the prior years had been paid, as a fund out of which to construct a court house. An order creating a county courthouse fund is not illegal merely because criminal cost bills had been held up for a few months.

2. ———: **Statements of Judges: Services of Officer.** Testimony of the prosecuting attorney to the effect that he was told by the judges of the county court that they had no money with which to pay his account for services rendered, is incompetent. The court speaks by its records, and the talk of a judge outside of the record is no evidence of the state of the account shown by the books.

3. ———: ———: **Building Bridges: Transfer of Money to Court-house Fund.** Where the county court had advertised for bids for bridges, and the record shows that on the coming in of the bids "the building of the same is abandoned by the court and no contract for the same is let," it is not competent to show by the testimony of one of the judges that the court refused to enter into the contracts "because they did not have the money in the bridge fund to pay for them." The lack of money in that fund applicable to such purpose cannot be shown in that way. Besides the argument moves in a circle, and begs the question, since it assumes that the transfer of moneys, collected the previous year, from the bridge and road fund to the court-house fund, was itself illegal. And, further, the cost of the bridges would primarily be charged against the revenue of the current year.

4. **STATUTORY CONSTRUCTION: Cardinal Rule.** A cardinal rule in the construction of statutes is to get at the intendment of the lawmaker and enforce that intendment. In doing that, the courts consider the former state of the law, the new provision, the evil sought to be removed, and the remedy provided, and so construe the law as to further the remedy and retard the evil.

5. **BUILDING COURTHOUSE: No Bonds.** A discretion has always been lodged in the county court by statute to build a courthouse, if "there shall be sufficient funds in the county treasury for that purpose, not otherwise appropriated, or the circumstances of the county will otherwise permit" (Sec. 6723, R. S. 1899); and where there is a surplus in the various county funds for the preceding year, after all warrants and debts have been paid, the court may transfer a balance, unappropriated and unused, remaining in those funds, to a courthouse fund and use it to build a courthouse, and is not compelled to submit to the people a proposition for an issue of bonds or a direct levy for that specific purpose.

6. ———: **Cash System.** The statutes put a stop to the credit system in administering the affairs of a county, and prescribe a cash system, but with such flexibility in the cash system as to permit the county court in any one year to contract, by way

Decker v. Diemer.

of anticipation, with reference to the revenues of that year. But the application of an unexpended balance in the five funds provided by statute for current county expenses, collected the previous year or years, when there are no unpaid debts or outstanding warrants against those funds, to the construction of a courthouse, is not a perversion of those funds, nor out of harmony with the cash system, nor is it forbidden by the statutes, although the amount so applied in any one year may not be sufficient to complete the building.

7. **County Expenses: Estimates: Amount of Levy: Discretion in County Court.** The county court is charged with the discretion of making estimates of moneys needed for the current expenses of the county and is authorized to make a levy, not in excess of the maximum rate permitted by the Constitution, sufficient to meet those expenses; and, absent fraud, the circuit or appellate courts will not interfere with the exercise of that discretion. So that where the levy for previous years was forty cents, and there remained a balance unexpended in the five county funds, after all debts were paid, a levy of fifty cents, not being in excess of the constitutional limit, and absent fraud, will not be interfered with, even though such balance was applied to the building of a courthouse, and it is charged and not denied that, if any balance should remain at the end of the current year in those funds, it will be applied in the same way to completing the courthouse.

8. ———: ———: ———: ———: ———: **Ornamental Waste.** Whether ornament in lieu of plainness in cornices, whether marble in columns, floors and stairways instead of concrete, shall be used in a courthouse or other public structure, are matters in the discretion of the county court.

9. ———: ———: ———: ———: ———: **Fraud.** It is a fraud to conceal a fraud, and it is a fraud for a county court to divert revenue to an unlawful purpose. But fraud must be proved. A tax levy of fifty cents in a growing county is not shown to be fraudulent by a showing that a levy of forty cents in previous years was sufficient for county needs, and left a surplus, nor by a showing that that surplus was transferred to a courthouse fund, for at most that act was a mistake in construing the law, and not fraudulent.

10. ———: **Excessive Levy: Transfer of Surplus in County Funds to Courthouse Fund: Bonds.** County courts cannot make excessive levies for county purposes for the very purpose of evading the statutes and creating a surplus to build a courthouse, thereby, under the seeming forms of law, evading the spirit and intent of the law. But under Secs. 6723 to 6729, R. S. 1899, if

Decker v. Diemer.

the county has a surplus of money in the county funds, levied
and collected for previous years, after all warrants and debts
against those funds have been paid, it is not compelled to carry
that surplus forward from year to year to be used only as
originally appropriated and to reduce the current tax levy for
current county purposes, nor is it compelled to resort to a
bond issue or a special tax levy to build a courthouse, but the
county court may apply that surplus and the back taxes collect-
ed to the building of a courthouse. And the Cottey Act (secs.
9273 to 9278, R. S. 1899) is not inconsistent with that holding,
and is not applicable to such a condition.

Appeal from Greene Circuit Court.—*Hon. C. H.
Skinker,* Special Judge.

AFFIRMED.

*W. D. Tatlow* and *J. P. McCammon* for appel-
lants.

(1) County courts have no implied power to levy
taxes. The power must be expressly given by statute,
and if conditions as to the exercise of the power are
essential, they must be followed. When such condi-
tions are made essential to the exercise of the power
they must be observed before the power can be law-
fully exercised. State ex rel. v. Railroad, 87 Mo. 239;
R. S. 1899, secs. 9273-4. The evidence showed that
the levy made by the court for current county ex-
penses is the same levy which had, in the year preced-
ing, according to the recital of the order of the court,
produced a surplus of $50,000. Added to this is the
additional levy for road and bridge purposes of twenty
cents on the hundred dollars valuation, which relieved
the current expense fund of the amount necessary to
be levied for that purpose the preceding year—in ef-
fect increasing the levy to a seventy cent instead of a
fifty cent levy. To these add the facts that the wealth
of the county increased a million and a quarter dol-
lars in the year, still further reducing the necessity

for a large levy, and that the court is going on with the building of a large courthouse 100 by 200 feet and four stories in height, of stone and reinforced concrete, and that no explanation is vouchsafed by the judges, though present at the trial in an action which calls upon them to purge their consciences, and the evidence is conclusive that the purpose and intention of the defendant judges is to levy a tax which, though ostensibly for current county expenses, is in fact to accumulate an excess to be used in the building of a courthouse. If the order made by them had accurately stated what they were doing, it would have stated that they levied so many cents on the $100 for current county expenses and so many cents for the purpose of building a courthouse. This, without an order of the circuit court under the procedural limitations and conditions of section 9274, they could not do. The law requires a true record of the proceedings in fact had by the court, and the falsification of the record as to the real purpose will not avail when the real interest is shown. State ex rel. v. Cunningham, 153 Mo. 653. (2) The Legislature has limited the power of the court in making a levy to the necessity for county purposes. R. S. 1899, sec. 9280. But in making the estimate it must make an honest estimate for the particular purpose. This obligation is not at all weakened by the permission given to eke out the deficiency of one appropriation from the surplus of another when the honest estimates have proved to be erroneous. State v. Freeholders, 29 Atl. 332; Ault v. Hill County, 116 S. W. 359; Ault v. Hill County, 111 S. W. 426; Iron Co. v. Hart, 45 S. W. 321; Railroad v. Dawson County, 11 N. W. 307; Railroad v. Board, 61 S. E. 699; State ex rel. v. Hopkins, 41 Pac. 206; Brown v. Clemmer, 89 Pac. 325. (3) Funds to build a courthouse may be legally levied. That other provisions for raising funds with which to build a courthouse

are made by the statute is sufficient to show it was not the intention of the Legislature to pay for it out of the general fund. State ex rel. v. Macon County, 68 Mo. 29. The Constitution and the Legislature have provided three ways of supplying the means to build a courthouse. 1. By submitting the question of a bond issue to the voters. 2. By submitting to a vote the question of a special tax for the purpose. 3. By presenting through the prosecuting attorney a petition to the circuit court, showing the necessity, and on obtaining the order of the court or judge, making such a levy within the limits of the annual levy. These ample and extraordinary provisions, as in the Macon county case stated, preclude any resort to the funds provided for the ordinary expenses of the county, in the payment of such extraordinary expenditures as are here involved. That such extraordinary expenditures require the levy to be made on proper procedure by order of the circuit court is decided and held by this court in other cases. State ex rel. v. Railroad, 130 Mo. 243; State ex rel. v. Railroad, 97 Mo. 296; State ex rel. v. Railroad, 87 Mo. 236; State ex rel. v. Railroad, 92 Mo. 152; State ex rel. v. Railroad, 169 Mo. 577. (4) The funds raised for any certain purpose are impressed with a trust in the hands of the officers, and may only be legally expended for that purpose. 27 Am. and Eng. Ency Law, p. 807; Coler v. Board, 89 Fed. 257; State ex rel. v. Cottengin, 172 Mo. 129; Knox County v. Hunolt, 110 Mo. 67; Book v. Earl, 87 Mo. 246.

*Roscoe C. Patterson* and *Edgar P. Mann* for respondents.

(1) (a) The order of the county court of February 3, 1909, is prima-facie evidence of the truth of the recitals therein contained. State ex rel. v. Rail-

road, 101 Mo. 149; State ex rel. v. Bridge Co., 134 Mo. 339. (b) And in proceedings to enjoin the county judges from levying illegal taxes it cannot be presumed, in the absence of proof, that they would be guilty of making such a levy in violation of the law. State ex rel. v. Hagar, 92 Mo. 511. (2) (a) The recitals of the order of the county court of February 3, 1909, show that the court was proceeding toward the erection of a courthouse in strict conformity to the statutes. R. S. 1899, sec. 6723. (b) And that in the subsequent orders made in the proceedings and shown in the record, they proceeded exactly according to the terms of the statutes, and had so proceeded up to the trial of this case. R. S. 1899, secs. 6725-9. (3) It is not necessary, when there are sufficient funds in the county treasury for that purpose not otherwise appropriated, or the circumstances of the county will otherwise admit, to submit a proposition to the people to vote bonds or a special levy to build a courthouse. Under such condition of facts, the erection of the building and the appropriation of the money is entirely in the discretion of the county court. R. S. 1899, sec. 6723; State ex rel. v. Howell Co., 58 Mo. 583; State ex rel. v. Bollinger, 219 Mo. 209; Wolcott v. Lawrence Co., 26 Mo. 276; Anderson v. Ripley Co., 181 Mo. 62. (4) Neither was the county court inhibited by the provisions of section 1923 from transferring this fifty thousand dollars to a courthouse fund, as they did by their order of February 3, 1909. The levy authorized by law is an annual levy. Each year, or the revenues, rather, of each year, must provide for the indebtedness of that year. After that is done the revenue becomes a surplus. The purposes for which the fifty thousand dollars transferred to the court house fund had been levied, to-wit, the payment of the obligations incurred by the county for 1908 and years prior, had been satisfied. Said section 1923,

upon which appellants rely with such show of confidence, expressly warrants this transfer and appropriation under these circumstances. (5) The fifty thousand dollars transferred to the courthouse fund by the order of February 3, 1909, was levied for a sacred purpose and was a trust fund for that purpose, to-wit, to meet the obligations of the county for current expenditures for the specific years for which the levies were made. For instance, the levy for the year 1908 could only be used to meet the obligations for that year, and the funds were sacred to that purpose, but after those were satisfied the funds were no longer sacred and the balance was a surplus that might be applied to other legitimate purposes for the benefit of the county. It was then, in the language of the section, not otherwise appropriated, and might in the discretion of the county court be used to build a courthouse. R. S. 1899, secs. 6723 and 1923. It may, then, be applied to obligations not of the character for which it was originally levied. Anderson v. Ripley Co., 181 Mo. 64; Book v. Earl, 87 Mo. 250; Andrews Co. v. Schell, 135 Mo. 39; State ex rel. v. Railroad, 169 Mo. 576; State ex rel. v. Johnson, 162 Mo. 630; State ex rel. v. Cottengin, 172 Mo. 134; State ex rel. v. Payne, 151 Mo. 663.

LAMM, J.—Injunction in the circuit court of Greene county, brought May 11, 1909. No temporary restraining order was asked. November 30th plaintiffs filed an amended bill. The abandoned bill is not preserved in the record and we know nothing of its allegations.

In substance the amended bill alleges that Bowland was treasurer of Greene county; that Bowman is a commissioner appointed to select a site for a courthouse in Springfield; that Diemer is the presiding justice, and Reed and Appleby associate justices, of

the county court of Greene county; that in 1908 "and prior years" there was levied a tax of fifty cents on the $100 valuation of property in that county for ordinary current expenses; that on February 4, 1909, the majority of said county court, Diemer and Reed, over the "dissent of Appleby," in violation of law and their duty, entered an order reciting, *inter alia,* that there was on that day in the hands of the county treasurer a surplus of $50,000 collected from the taxes of the year 1908 and prior years, assessed and levied for county purposes, which sum had not been appropriated otherwise; that such alleged surplus (up to that time apportioned on the books of the treasurer among the various county funds) be set aside and appropriated for the purpose of purchasing a site and building a new courthouse for Greene county; that the treasurer transfer said sum on his books from said various county funds to a fund for that purpose (the same being the only money in said courthouse fund); and that a new courthouse be built therewith to cost, with the site, not exceeding $100,000.

The bill goes on to allege that said moneys were proceeds of taxes levied and collected in the years mentioned for ordinary current county expenses and the same would be required "during the current year" in the payment of necessary county purposes, that is, care of paupers, building bridges, repairing roads, the pay of road overseers, salaries of county officers, the per diems and mileage of witnesses, fees of grand and petit juries and pay of judges and clerks of elections; that said moneys are not a "surplus" for use in buying a site and building a courthouse; that said judges had no warrant in law to use said funds for that purpose or for any purpose other than the one for which the taxes were levied and collected; that they had no right to make such order of transfer to a "Courthouse Fund," or draw any warrants thereon

except for the payment of ordinary current expenses,
nor had the defendant, Bowland, the right as treasurer
to make such transfer or honor any warrants drawn
thereon for buying a site or building a courthouse,
or for any purpose other than the one for which the
taxes were levied and collected; that the funds afore-
said constituted a trust fund for their original pur-
poses, and if there was any of such moneys left at the
end of the year 1908, it was the duty of the court (in
making the estimate for the tax levy for 1909) to re-
duce the taxes for that year by the amount unex-
pended in the former year and make a new levy suf-
ficient to produce the balance required to pay the or-
dinary current expenses for 1909 and no more; that
the purchase of such site and the erection of such build-
ing are not ordinary current expenses of the county;
hence the orders and acts of said officers in that behalf
were illegal; that in pursuance of such illegal purpose
the order of February 4, 1909, appointed Bowman to
select a site and Bowman reported such selection; that
defendants Diemer and Reed approved it, caused a
deed to be taken therefor, drew warrants upon said
funds so transferred, and caused Bowland, treasurer,
to pay out $12,825 without warrant of law and in vio-
lation of the duties of the defendants as judges and
treasurer of said county; that said order recited
that with the $50,000, so illegally diverted into a
"Courthouse Fund" (and "with other funds pro-
posed to be acquired"), the defendants intended to
build a courthouse and buy a site costing not more
than $100,000, as said; that plans were advertised for
and selected for a courthouse and defendants intend
to let a contract for the same; that at that time defend-
ants knew that they could not buy the ground and
build a courthouse "such as they intended to build"
for $100,000; that the courthouse contemplated by

229 Sup—2c

the plans and specifications will cost $200,000 "and probably much more," as they knew at the time, and that the orders made and the subsequent proceedings under it were made and done "only to have the construction of a courthouse begun and compel the building and completion of the same on the lot which they had selected;" that a fifty-cent levy on the $100 of valuation is not necessary to pay the ordinary current expenses of Greene county and the county court is without power to levy taxes in excess of what is reasonably required for such purposes.

The bill then tabulates the amounts raised under a forty-cent levy for county purposes in the years 1905 and 1906, and a fifty-cent levy in 1907 and 1908, which amounts, it is alleged, were ample to pay all the ordinary current expenses of the county for those years; that notwithstanding that fact, in 1909 the majority of said county court (the defendants Diemer and Reed) have made a levy for bridge purposes of twenty cents and for other ordinary current expenses of the county of fifty cents on the $100 of valuation; that such levy for county purposes will produce $106,000, and that for bridge purposes about $42,000; that the $106,000 levy for county expenses, exclusive of the bridge levy, will be much more than will be required for ordinary current county expenses; that this excess was levied for the object and purpose of transferring it into the "Courthouse Fund," thereby continuing the illegal diversion of taxes from the purpose for which they were pretendedly levied and collected; that said illegal proceeding and the acts and doings of the court and of said Bowland and Bowman "are a fraudulent scheme, trick, device and subterfuge on the part of said defendants to enable them under the cloak of the seeming forms of law, to carry out their illegal purposes to collect an excess over what is really necessary to pay the ordinary current expenses of the coun-

ty and transfer such excess, as was done by them by said order of February 4, 1909, to the so-called 'Courthouse Fund,' and use the same in payment for plans and specifications for said courthouse, for the superintendence of the same by defendant Bowman and for its construction, all of which is in violation of law and in disregard of their official duties;'' that the acts done and threatened will have the effect to impose upon plaintiffs and the other taxpayers of the county, a burden of taxation without warrant of law; that plaintiffs are without adequate legal remedy; that they are now citizens of this State and residents and taxpayers of Greene county; that they bring their action on their own behalf and on that of persons similarly situated.

The premises considered, the bill prays that defendants be enjoined from contracting for plans and specifications for said courthouse, and superintending its construction, and constructing the same, and paying any money whatever therefor or for a site, material or labor, etc., until there is money in their hands legally applicable and appropriated to such purpose, and from drawing warrants upon such transferred funds in pursuance of said illegal scheme, and from hereafter transferring funds levied for ordinary current expenses to other purposes than those for which the funds were levied and collected; that the judges of the county court be enjoined from making a tax levy for the current year in excess of what is necessary for the ordinary current expenses of the county and that the treasurer be enjoined from paying warrants drawn in pursuance of the scheme outlined; that defendants be ordered to retransfer the sums illegally transferred as aforesaid back to the funds from whence the so-called courthouse fund came. General relief was also prayed.

The answer admitted Bowland was treasurer,

that defendants Diemer, Reed and Appleby were judges composing the county court, as presiding judge and associate judges, in the order named; but denies every other allegation in the petition.

Supplementing the admissions of the answer, it was agreed below that plaintiffs are freeholders and resident taxpayers of Greene county.

It seems that in 1904 the county court of Greene county contemplated a bond election and issue to build a courthouse; that, needing an attorney in and about the execution of such plan and the buying of a courthouse site, they contracted in that behalf with Benjamin U. Massey; that presently they appointed Mr. Massey a commissioner to purchase a site adjacent to the jail lot owned by the county (describing the ground desired), and ordered warrants drawn on the ''contingent fund'' to pay for the same; that at that time they transferred $6000 from the road and bridge fund to the contingent fund; that presently Massey reported the purchase of the desired property, that the circuit court had approved the title and the commissioner was ordered to accept the deed and the clerk to issue a warrant in payment, as well as one for the first instalment of Massey's fee. It seems, moreover, that the county paid $3500 on this purchase; that presently a suit was brought challenging the legality of the purchase; that a decree followed adjudging such illegality, but decreeing a lien in favor of the county on the lot for the payment actually made, and that the whole scheme then fell through.

February 3, 1909, the county court made and entered the following:

''Whereas the courthouse belonging to Greene county and now occupied by it for county purposes is old and dilapidated and wholly inadequate in size and internal arrangement for courthouse purposes for this county; and,

"Whereas, no fire protection by means of vaults or otherwise for county records can be provided in said building, and the entire records for the county are exposed while kept therein to imminent danger of destruction by fire, the court thinks it expedient to erect a new courthouse for said county; and,

"Whereas, all of the warrants of the county issued in payment of obligations incurred for county purposes for the year 1908 and all prior years, have been fully paid or provided for, and there remains no unpaid debt, debts, obligation or obligations of the county against the general revenue thereof for the year 1908, or any previous year not provided for; and,

"Whereas, after all past obligations for the year 1908 and prior years have been so fully paid and discharged or provided for with cash in the treasury to pay the same, there now remains and is on hands with the treasurer of the county a surplus of fifty thousand dollars collected from the assessment and levy for county purposes for the year 1908 and prior years, which said sum has not been otherwise appropriated and is available for the purpose of building a new courthouse for said county; and,

"Whereas, the circumstances, as well as the best interest of the county will admit of a sale of the present courthouse and the land or lot on which it is situated, which is worth and for which the county can obtain the cash price of $50,000; and,

"Whereas, the circumstances of the county will, therefore, permit the county to erect a courthouse to cost, together with the land on which it is located, the sum of $100,000.

"It is, therefore, ordered by the court that the said surplus of county revenue funds now apportioned by the county treasurer on his books among the various county funds, to-wit, the sum of $50,000, now in

the hands of the county treasurer, levied for 1908 and prior years, be, and the same is, hereby set aside and appropriated for the purpose of purchasing a site and building a new courthouse for Greene county. And that the county treasurer is hereby ordered to transfer on his books from the various county funds said $50,000 to the county revenue fund.

"And it is further ordered that the present courthouse of said county, and the lot or land on which it is located, be sold for the sum of not less than $50,000, in cash, and the sum so realized be appropriated and added to the aforesaid appropriated sum of $50,000 for the purpose aforesaid.

"It is further ordered that a new courthouse for Greene county be built with the funds so provided and appropriated to cost, with the sum necessary to be expended for a new site therefor, not to exceed the sum so provided and appropriated.

"The court further finds that T. K. Bowman, of Springfield, Missouri, in this county, is a suitable person, and he is hereby appointed to superintend the erection of said courthouse.

"The court further finds that there is no suitable ground for the purpose belonging to the county within the limits of the town or city of Springfield, the established seat of justice of said county, and the said superintendent is therefore ordered to select a proper piece of ground within the corporate limits of said city of Springfield and purchase, or receive the same by donation, for a site for said courthouse, and take a good and sufficient deed for the same to the county, and make report of his proceedings to the circuit court of Greene county at the next sitting, and to this court for its approval."

Under that order Bowman qualified as superintendent. On the 11th of February following, he reported in writing the selection of a courthouse site at

a cost of $12,825. It seems to have been the same se-
lected five years before by commissioner Massey, on
which the county had a lien for $3,500. The report
showed the abstract of title submitted to the circuit
court of Greene county, and the title approved by that
court. A deed conveying the site to the county was
submitted with the report, the latter aptly referring to
the order of appointment. No question is made over
its form. On that report coming in, it was approved
by the county court and a warrant for the purchase
price was ordered, deducting the lien in favor of the
county. The order of approval described the prop-
erty, set forth the report *in haec verba* as well as the
finding and judgment of the circuit court approving
the title, attested by the hand of the clerk and the seal
of the court. After such recitals the order concludes
as follows:

"It is therefore ordered by the court that the se-
lection of the piece of ground or real estate so made
and reported by the said T. K. Bowman, superin-
tendent, be, and the same is, hereby approved, and
that the said purchase and the terms thereof be, and
the same are by this court hereby approved, and that
the clerk of this court issue to said Bank of Spring-
field a warrant upon the courthouse funds of this
county for the said sum of nine thousand three hun-
dred and twenty-five dollars, and apply said warrant
to the payment of the consideration so coming to the
Bank of Springfield for the purchase of said property.

"JUDGE S. D. APPLEBY, dissenting."

The owner surrendered an old warrant it had
held for the purchase of the same property since
Massey was commissioner in 1904 under the aban-
doned scheme, and that warrant was cancelled.

At this stage the situation was this: the county
had become the owner of record of a new courthouse
site in fee-simple. A courthouse fund had been created

out of the surplus of odds and ends of funds remaining unused from prior years) of $50,000, which fund was to be increased (by the anticipated sale of the old courthouse at $50,000) to $100,000.

Presently on April 5, 1909, the county court in regular session made and entered the following order:

"Whereas, it appears to this court that the various funds into which the county revenue is subdivided are for the time being insufficient in amount to meet the warrants for current expenses required to be drawn against them in the ordinary course of the county's business, and it further appearing to the court that all the obligations of the fiscal year 1908 and prior years of the county have been fully paid or provided for out of the revenues of such years, and it further appearing to the court that the revenues that will be produced by the annual levy for the fiscal year 1909 will be fully sufficient to meet all the current expenses of the county for the said year 1909, as soon as the collections for said year are made by the collector and turned in, and that the lack of funds to meet the payment of the county warrants now being drawn for current expenses is only temporary and will cease to exist as soon as the collections of taxes for the current year 1909 begin, and it further appearing to the court that there is on hand in the county treasury a balance of the sum of $41,465.53 belonging to the courthouse fund of that county, set aside for that purpose out of the surplus revenues of the county by an order of the court heretofore made, and that the balance of said fund will not be needed for the erection of the courthouse until it can be repaid out of the general revenue funds transferred to it for the purpose of relieving the temporary deficiency in said general revenue fund;

"It is therefore ordered by the court that the county treasurer transfer the sum of $20,000 of the

balance remaining on hand of said courthouse fund to the general revenue fund for the purpose of meeting the present temporary deficiency in the general revenue fund until such time as upon the order of this court he shall be directed to replace the same from the general revenue fund of the county.''

Preserving the order of the march of events, on the 11th of the following May plaintiffs, as said, brought suit. Thereafter on August 1, 1909, the county court made an additional order as follows:

''Whereas it appears to this court that the various funds into which the county revenue is subdivided are for the time being insufficient to meet the warrants for current expenses required to be drawn against them in the ordinary course of the county's business, and it further appearing to the court that all the obligations for the fiscal year 1908 and prior years of the county have been fully paid and provided for out of the revenues of such years, and it further appearing to the court that the revenues that will be produced by the annual levy for the fiscal year 1909 will be fully sufficient to meet all the current expenses of the county for the said year 1909 as soon as the collections for said year are made by the collector and turned in, and that the lack of funds to meet the payments of the county warrants now being drawn for current expenses is only temporary and will cease to exist as soon as the collections of taxes for the current year 1909 begin, and it further appearing to the court that there is on hand in the county treasury a balance of the sum of $21,944.65 belonging to the courthouse fund of the county, set aside for that purpose out of the surplus revenues of the county by an order of the court heretofore made, and the balance of said fund will not be needed for the erection of the courthouse until it can be repaid out of the general revenue funds transferred to it for the purpose of relieving the tem-

porary deficiency in said general revenue fund. It is therefore ordered by the court that the county treasurer transfer the sum of $10,000 of the balance remaining on hand of said courthouse fund to the general revenue fund for the purpose of meeting the present temporary deficiency in said general revenue fund until such time as, upon the order of the court, he shall be directed to replace the same from the general revenue fund of the county."

On September 8, 1909, an order was entered by the county court selecting Miller, Opel and Torbitt as architects for the new courthouse. Such order narrates that plans now presented by them be the plans of said building; that they are ordered to draw specifications for the same and are to receive two and one-half per cent of the cost of the building for said plans and specifications, and one per cent for drawing details, as compensation.

Oral evidence went in for plaintiffs. By Tippin, assessor, it was shown that approximately the county's assessment, made in 1909 for the tax levy of 1910, was twenty-five and one-half million dollars; that of 1908 for the tax levy of 1909 was a few thousand less than twenty-one and one quarter million; that of 1907 for 1908 was twenty million, and that of 1906 for 1907 was seventeen and a half million.

County clerk, Bair, was put on the stand. We will not darken the case with the cloud of figures in the record. The substance of his testimony was that for the first quarter of 1909 there were paid out on warrants for the new courthouse a little the rise of $9400, in another quarter $1007.28, and subsequently $1887.87.

From the books produced and from the testimony of this officer it appears that the county revenue was apportioned between funds known as the poor fund, road and bridge fund, officers' salary fund, court and

election fund and contingent fund.  His figures show the amounts apportioned to these funds at stated times and those paid in by the collector, but establish no material issue.  The levy for 1909 for county purposes was fifty cents, and for roads and bridges twenty cents, on the one hundred dollars of valuation.  To make the fifty thousand courthouse fund there were taken sundry amounts from those several funds on February 15, 1909, pursuant to the order of February 3d.  The funds depleted accrued from revenues collected in 1908 and back taxes of prior years.  None of the transferred money was taken from the revenue of 1909.  All of the warrants issued for everything due from the county for 1908 were paid prior to the transfer order of February 3d, and everything due by the county was paid.  After the transfer there was money left in each of those funds and witness thought none of the transferred money was required for the paying of county warrants for 1908 and prior years.  He knew of no such warrants outstanding.  The temporary transfers from the courthouse fund back to the several funds, ordered on April 5 and August 4, 1909, were made.  There was then a deficit of funds to meet the *present* demands for the year 1909, as at that time the revenue for the current year had not come in.  The 1909 tax book was not turned over to the collector until September.  Witness gave the following summary of the county expenses for the years 1905 to 1909, *viz*:

For 1905, $70,579.06; for 1906, $72,484.80; for 1907, $106,542.30; for 1908, $99,616.54; for 1909 to date, $89,895.00.  Expenditures for the same time aggregate $429,790.98.  Expenditures do not include amount paid on the courthouse, nor transfers from one fund to another.  The $50,000.00 taken out of the county revenue and transferred to the "Courthouse Fund" is not included in the above statement.

Plaintiffs here introduced the warrant register showing the aggregate expenditures for 1905-6-7-8 at a

somewhat different figure from those just given by the witness.

Mr. Torbitt, a member of the firm of Miller, Opel & Torbitt, architects, was put on for plaintiff. By him it was shown what had been done in the work of constructing the new courthouse. The plans and specifications had been completed. The footings for the courthouse were in and enough macadam on the ground to complete the foundation walls, that is, everything has been completed below the superstructure itself. The size of the building is about 100 by 200 feet, and witness had made estimates of its cost. "We estimate," he said, "that this building can be put in condition for occupancy for $100,000." By "occupancy," the witness meant that for that figure the rooms shall be finished ready for furniture, the corridors, floors and so on shall be put in, and the plastering done, and everything completed ready for the furniture according to the plans and specifications. Sifted closely on the plans, witness said: The roof was composed of asphalt, gravel and paper reinforced with concrete under it. The floors were reinforced concrete. No contractors had figured on the plans and specifications. In the given estimate was included the cost of material, construction and supervision, and the building was to be built by contract to be made. The stories were to be 15, 15, 14, and 13 feet respectively in the clear. The plans did not contemplate marble columns at this time, but they were arranged so that marble can be used whenever the county sees fit to put it in. Witness arrived at his estimate of the cost "by comparisons and not by items;" had a general idea in regard to the cost of stone, but not absolutely. He knew approximately what buildings of that character cost per cubic foot of contents, but could not state how many cubic feet of brick there were in the walls. Brick would cost about $12 a thousand in the walls, but he had no idea of the number required. It is not the

business of architects to make estimates "by items."
They never do that, but make them "by comparisons."
In this case the estimate was arrived at in that way.
He declined, therefore, to give estimates of the items
of reinforced concrete floors, quarter-sawed oak in the
rooms, of oak flooring, plastering, stone in the walls,
tile floors, glass and hardware, etc., shown by the
plans and specifications. He figured that the building
can be built as it is for about eleven cents per cubic
foot of contents. It is not the intention to put in
ornamental work for cornices at this time. The esti-
mate did not include ornamental work. It was not a
matter of importance to the building so far as occu-
pancy was concerned whether ornamental plastering
was done. It was only hoped for. The plans and
specifications will be made so it can be put in if re-
quired. It is not intended to put a dome on the build-
ing, though the specifications so provide and the dome
is not included in the estimate. The same was true of
the "Scagliola cornices." Witness did not know the
amount of steel required. It would be worth about
$25 per thousand pounds laid on the ground. The
specifications do not provide for heating nor electric
lighting. These items would cost from $5200 to $5500.
The plumbing is not included in the specifications. It
would cost $4000. The vaults are included, but no
doors. Vault doors are a part of the furniture. Eleva-
tors are not included, but the plans have a place for
them.

On cross-examination, witness reiterated that
architects make their estimates of cost by cubic foot
and not by item, buildings of a certain character run
approximately the same. The building contemplated
by the plans is four stories—a basement and three
stories. The fourth story was intended for the use of
the appellate court, but there is a library and an-
other courtroom contemplated up there. It is "con-
templated" that if necessary the upper story can be

eliminated. Proceeding the witness said: "There are other things that can be eliminated—so in case the proposition goes above the present appropriation we can work this proposition into this amount." The specifications have never been approved or adopted and the finishing drawings have never been finished, except sketches in a general way and they are not ready to be submitted for bids.

On re-examination witness said if the upper story is eliminated the building can be finished with marble floors and finished as it should be for $100,000. Contractors vary sometimes 25 per cent in bids and witness could not say whether the building could be completed with the upper story for that amount. At this point the following questions were asked and answered:

"Q. If you thought it could be finished properly you would not have omitted the plumbing and the excavation and the grading and the heating and the wiring and the dome and the vaults and the other things that have been omitted? A. It was never intended to build a dome; it was merely provided so that if a future court would want to build a dome they wouldn't by the heavy load on the building depreciate it. It is not intended to leave out the heating or any of that work. It is customary to make a special specification for that, and the foundation specification has already been made and the work going on with county prison labor.

"Q. But these other items are not included in this $100,000. A. *They are. The plumbing and heating are included.* The final working drawings have not been approved."

On inquiry, by the court, witness said that no specifications had been approved except for the foundation. It was intended to have the entire specifications gone over item by item and passed upon. They had been prepared, but not yet submitted for inspec-

tion. The plans for the foundation have been passed upon, but the working drawings were not approved. The preliminary drawings for the heating have been prepared. Witness had seen them and they had been approved by the court.

Mr. West, prosecuting attorney of Greene county, was introduced by plaintiffs. He went into office January 1, 1909. About the first of July of this year he had an account for services against the county, which he presented to the county court, yet unpaid. (Note: the time of the trial was December 3, 1909). Witness was allowed to say "they" (that is, the judges of the county court) "said they didn't have any money." In cross-examination it developed that this claim for services was for fees due witness for convictions during the year 1909. He was allowed to say on redirect examination that he knew of fee bills presented for 1908 and not paid. Witness had signed fee bills aggregating approximately a couple of thousand dollars. These fee bills were signed in the year 1909, some time in February. Some of them "were where the party had just scheduled out of jail."

At this point plaintiffs offered a bundle of unpaid fee bills aggregating $1090, filed in the office of the county clerk, May 17, 1909, and certified by the proper officers, being for criminal costs which accrued in the years 1908 and 1907. They were excluded on the objection of defendants and plaintiffs saved the point.

The dissenting judge, A. P. Appleby, was called for plaintiffs. It was proposed to show by him, as we understand it, that in the year 1909, after the order creating the courthouse fund, the county court advertised for bids for building two bridges, one over the James and one over the Sac river. That bids were handed in and accepted and the county court refused to enter into a contract "because they did not have the money in the bridge fund to pay for them." The court refused the testimony because the bridges would be

properly chargeable against taxes levied for 1909, and because the county court record is the best evidence. Such record was then offered showing advertisements for two bridges and bids submitted, "but the building of the same was abandoned by the court and no contract for the same let."

Defendant Bowland, county treasurer, testified that his books showed a balance on hand in the county revenue on December 31, 1908, of the rise of $12,000; that he had received from the county collector since then the rise of $83,000, and from other sources the rise of $1300, making a total to September 15, 1909, of $97,600.84; that he had paid warrants for the first three quarters of the year on the five aggregate funds of $72,356.12; that the salary account for the current year was about $10,000, the contingent fund more than that, and the bridge fund about the same; that the courthouse fund is not included in the foregoing statement of expenditures; that on the date the court set aside $50,000 for a "Courthouse Fund," there was a surplus of more than $50,000 in the various funds of the county after all the outstanding warrants for the year 1908 had been paid.

The suit was brought in Judge Neville's division of the Greene Circuit Court. He disqualified and sent it to the division presided over by Judge Page. He in turn disqualified, and Judge C. H. Skinker was called in as a special judge. The latter finding the issues on the merits for the defendants, dismissed the bill, and plaintiffs appeal here in due time and apt form.

In this court, under spur of public welfare, the case was advanced and assigned to *Banc*. It was argued at our bar on the theory that, pending appeal, the old courthouse had been sold for $50,000, and the "Courthouse Fund" so swollen now came up to the $100,000 mark named in the order of February 3d.

Learned counsel rely on certain provisions of the statutes. Appellants say the court erred in not giving effect to an act known as the Cottey Act, Laws 1879, p. 185, now part of article 5, chapter 149, Revised Statutes 1899, entitled "Revenue," and other provisions of that article, and section 1923, Revised Statutes 1899, enacted in 1874. Respondents rely on section 6723 in article 2, chapter 97, entitled "Counties," and other sections of that article and of the general statutes. They also contend that the Cottey Act must be read in connection with said article 2 of chapter 97 and the two harmonized, and that, when properly interpreted, there is no antagonism between the two. *Contra,* appellants contend that the Cottey Act is a later act and should control.

There is a subsidiary assignment of error, somewhat faintly pressed, relating to the exclusion of testimony.

On such record and assignment of error we rule as follows:

I. (a) There was no error in excluding the bundle of unpaid fee bills aggregating $1090 for criminal costs in 1908 and 1907. There is no proper evidence showing that at that very time there was not money in the proper fund sufficient to pay them; for the balance in such fund, appearing on that date in the books of the treasurer, is dark. Hence it would be a mere guess to say that the reason the bills were unpaid was a deficiency of funds. It is common knowledge that such bills often remain unpaid because of disputes and for other reasons deemed sufficient by the county courts, fee claimants have their remedy for an improper refusal to pay, and it would not do to hold that the order creating a courthouse fund on February 3, 1909, was

229 Sup—21

illegal merely because some criminal cost bills were held up a few months later.

So the evidence of Mr. West (delivered on December 3, 1909) to the effect that he was told by the judges of the county court that they had no money to pay his account for services rendered in 1909 is of no probative value. The county court speaks by its record. The talk of a judge outside the record of his court is no evidence of the state of accounts shown by the books. Furthermore, West's services for 1909 were, primarily, chargeable against the revenues of that year.

(b). It seems in 1909 the county court advertised for bids for a bridge over the James river and another over the Sac, and bids came in. Its records shown that "the building of the same was abandoned by the court and no contract for the same was let." Plaintiffs undertook to supplement that record by the oral testimony of the dissenting judge, Appleby, tending to show that these bids were rejected because there was no money in the bridge fund. It is next argued, as a sequence, that the money of that fund had been illegally absorbed in the "Courthouse Fund," *ergo,* the bridges were not put under contract. But that argument runs in a circle, it begs the question by *assuming* the illegality of the courthouse fund. The amount of the bids for the proposed bridges is not shown, nor the state of the road and bridge fund at the precise time the bids were rejected. The treasurer's books would have been the best evidence on that. Not only so, but the cost of these bridges would, primarily, be a charge against the revenue of the year 1909.

Presumably in making the tax levy and estimate for that year for county purposes the court took account of needed bridges and provided for them. If it, by its order of February 3d, illegally transferred money from the bridge and road fund, that is a serious

matter to be determined on its own merits from the then status of things and the law of the case. The mere isolated fact that a certain time afterward in the year 1909 the court abandoned the scheme of building two bridges does not determine or tend to determine such illegality, even if we should assume that the real reason for such abandonment was because an unexpended surplus in the bridge fund of 1908 had been transferred to the courthouse fund. But, passing that view, what the trial court refused listening to was the testimony of one of the judges, necessarily his conclusions, as to the *reason* the bridge project was abandoned, but this would only have opened up a wide realm of conjecture. By that token, the other judges would be allowed to say (also *arguendo*) that the bridge levy for 1909 was sufficient to build the bridges in question, or that the bids were too high, or the bidders unsatisfactory, that there was a question sprung as to the best location of the bridges, that proper highways had not been opened or dedicated to public use to make suitable approaches to the bridges, or that there was a question as to whether the bridges called for by the advertisement were of the best kind. Clearly there was no lion in the way of a legal contract to build the bridges because an unexpended balance in the bridge fund for 1908 had been transferred to another account. This, since the court was authorized to contract with a view to the twenty-cent levy for bridge purposes for 1909, had it chosen to do so.

The point is resolved against appellants.

II. Sections 9273 to 9278, inclusive, Revised Statutes 1899 (article 5, chapter 149, supra), are the Cottey Act on which appellants lean as a staff. That act held a section reading: "All acts and parts of acts inconsistent with this act, or in any manner whatever

conflicting with the provisions of this act, are hereby repealed." [Laws 1879, sec. 7, p. 186.] It also had an emergency clause. We shall presently have to consider whether the Cottey Act repealed or modified the provisions of statute law relied upon by respondents in affirmance of the legality of the transfer order of February 3, 1909, creating a courthouse fund.

At the outset of the discussion it will do to say, that in the practical administration of the law, a cardinal canon of construction, steadily applied, is to get at the intendment of the lawmaker and enforce that intendment. To that end it is trite doctrine that we should consider the former state of the law, the new provision, the evil sought to be removed, as well as the remedy provided, and so construe the law as to further the remedy and retard the evil. Such is a venerable rule of construction, none the less alive because old. In Heydon's case, 3 Coke 7a, it was quaintly and strongly put in this way: "That for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law), four things are to be discerned and considered: 1st. What was the common law before the making of the act? 2nd. What was the mischief and defect for which the common law did not provide? 3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth? And 4th. The true reason of the remedy; and then the office of all the judges is always to make such construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief, . . . and to add force and life to the cure and remedy, according to the true intent of the makers of the act, *pro bono publico*."

Attending to the statutes it will be seen that, commencing in the early life of this State, a discretion always has been lodged in a county court to build a court

house if "there shall be sufficient funds in the county treasury for that purpose, not otherwise appropriated, or the circumstances of the county will otherwise permit." [R. S. 1899, sec. 6723.] The whole section reads: "Whenever the county court of any county shall think it expedient to erect any of the buildings aforesaid, the building of which shall not be otherwise provided for, and there shall be sufficient funds in the county treasury for that purpose, not otherwise appropriated, or the circumstances of the county will otherwise permit, they shall make an order for the building thereof, stating in such order the amount to be appropriated for that purpose, and shall appoint some suitable person to superintend the erection of such buildings, who shall take an oath or affirmation faithfully and impartially to discharge the duties enjoined on him by this article." Following that section there are provisions for appointing a superintendent, the designation of a site on county grounds at the seat of justice, and if there is no such suitable ground, the selection of a site by the superintendent within the limits of the county seat, the examination of the title by the circuit court, the payment for the site by the county, the submission of plans by the superintendent, etc. [R. S. 1899, secs. 6724 to 6729, inclusive.] Preceding that section is one (6709) providing for erecting and maintaining at the seat of justice in each county a good and sufficient courthouse. Following said section 6723 is another (6736) reading: "The county court of each county shall have power, from time to time, to alter, repair or build any county buildings, which have been or may hereafter be erected, as circumstances may require, and the funds of the county may admit; and they shall, moreover, take such measures as shall be necessary to preserve all buildings and property of their county from waste or damage."

It is to the foregoing body of statutory enactments that respondents look for authority to build a courthouse without an issue of bonds or the levy of a direct tax for that specific purpose by a vote of the people. They undertook to track these statutes and the case may proceed on the theory that they complied with them provided the statutes are operative and effective under the facts here.

They also point to a certain section which they say evidences a legislative policy permitting county courts to create a fund or a part of a fund for building a courthouse or buying a site out of odds and ends, in the nature of a surplus, of the funds in the county treasury remaining unappropriated and unused after the expenses of the county properly chargeable to those funds had been fully met. That statute is highly penal. [R. S. 1899, sec. 1923.] It denounces it a crime to appropriate or disburse money belonging to a county for any purpose or use other than the specific use or purpose for which the same was "devised, appropriated and collected, or authorized to be collected by law." If such misappropriation is effected the act is denounced as felonious embezzlement. If it be attempted but not effected, the act is denounced as a felonious attempt to embezzle. There is, however, a significant proviso made a part of the section, which, respondents insist, indicates a legislative policy applicable to the facts of our case. It reads: "Provided, however, that in any case when any money has been or shall have been collected by any . . . county for any specific use or purpose, and it is or shall have become impossible to use such money for that specific purpose, either by reason of the abandonment or failure of such use or purpose, or *the satisfaction of such use or purpose,* then . . . the proper officers of such . . . county . . . may appropriate such money to any other legitimate use or purpose without becoming liable to any of the aforesaid penalties."

There are two other sections of the Revised Statutes of 1899, *in pari materia*, *viz*:

"Section 6794. Whenever there is a balance in any county treasury in this State to the credit of any special fund, which is no longer needed for the purpose for which it was raised, the county court may, by order of record, direct that said balance be transferred to the credit of the general revenue fund of the county, or to such other fund as may, in their judgment, be in need of such balance.

"Section 6795. Nothing in the preceding section shall be construed to authorize any county court to transfer or consolidate any funds not otherwise provided for by law, excepting balances of funds of which the objects of their creation are and have been fully satisfied."

The Cottey Act, which it is insisted by appellants either repeals or so modifies the provisions of the statutes relied upon by respondents as to make them inoperative, provides (Sec. 9273) that hereafter there shall be levied, assessed and collected only the taxes following and in the manner following, not to exceed the rates prescribed by the Constitution and laws of this State, *viz*: "The State tax and the tax necessary to pay the funded or bonded debt of the State, the funded or bonded debt of the county, the tax for current county expenditures . . . and for schools."

The next section of said act (R. S. 1899, sec. 9274) directs that no other tax for any purpose shall be assessed, levied or collected except under certain named limitations or conditions, *viz*.: "The prosecuting attorney or county attorney of any county, upon the request of the county court of such county—which request shall be of record with the proceedings of said court, and such court—being first satisfied that there exists a necessity for the assessment, levy and collection of other taxes than those enumerated and specified in the preceding section, shall present a petition to the

circuit court of his county, or to the judge thereof in vacation, setting forth the facts and specifying the reasons why such other tax or taxes should be assessed, levied and collected; and such circuit court or judge thereof, upon being satisfied of the necessity for such other tax or taxes, and that the assessment, levy and collection thereof will not be in conflict with the Constitution and laws of this State, shall make an order directed to the county court of such county, commanding such court to have assessed, levied and collected such other tax or taxes, and shall enforce such order by *mandamus* or otherwise. Such order, when so granted, shall be a continuous order, and shall authorize the annual assessment, levy and collection of such other tax or taxes for the purposes in the order mentioned and specified, and until such order be modified, set aside and annulled by the circuit court or judge thereof granting the same: *Provided,* that no such order shall be modified," etc.

The next section provides a penalty for violating sections 9273 and 9274 and concludes as follows: "And the method herein provided for the assessment, levy and collection of any tax or taxes not enumerated and specified in section 9273 shall be the only method known to the law whereby such tax or taxes may be assessed or collected, or ordered to be assessed, levied or collected."

The next section applies the statute to county courts as well as to any judge thereof, etc.

The next section of the Cottey Act, section 9277, Revised Statutes 1899, reads as follows: "Any county court or judge thereof, or county treasurer, or county clerk, or other county officers, who shall order the payment of any money, draw any warrant or pay over any money for any purpose other than the specific purpose for which the same was assessed, levied and collected, or shall in any way or manner attempt so to do, shall be adjudged guilty of a misde-

meanor, and on conviction thereof shall be punished as provided in section 9275."

There are provisions of the general statutes to which we are referred. For instance, section 9282, which limits the annual tax on property for county purposes in counties of the population of Greene to fifty cents on the $100 of valuation. [Note: That is also the limitation in section 11 of article 10 of the State Constitution. But it is conceded that section of the Constitution has been amended so as to permit an additional levy for roads and bridges of twenty-five cents on the $100 of valuation. Laws 1909, p. 906; Laws 1907, p. 458.] And section 9283 which provides that, at its May term of each year, the county court shall "appropriate, apportion and subdivide" its revenues collected and moneys received "for county purposes" into five parts in an order directed by the statutes: First, a sum sufficient for the necessary expenses of paupers and insane persons; second, a like sum for the building of bridges, repairing of roads and the pay of overseers; third, a like sum for officers' salaries, payable out of the ordinary revenues of the county; fourth, a like sum for jurors' fees, witness fees and the pay of election officers; and, fifth, a like sum for "other current expenses of the county" not provided for as above, to be known as "the contingent fund of the county," and to be not over one-fifth of the revenue of the county "for county purposes for any one year." Other provisions, viz., sections 9286 and 9287, provide for the separation by the treasurer in his books of the revenue for county purposes for each year into funds designated as in section 9283, for drawing and paying warrants on the particular funds so designated, and providing penalties for violating the law.

Not only does section 11 of article 10 of the Constitution limit the rate of taxes to be levied by county courts, but the same section provides a scheme for in-

creasing the rate above the normal level for the purpose of erecting public buildings in counties where the people in their sovereign capacity authorize the increase by a two-thirds vote at an election. Section 12 of article 10 of the Constitution restricts the right of any county to become indebted in any manner or for any purpose in an amount exceeding in any year the income and revenue provided for such year, unless by the assent of two-thirds of the voters voting at an election held for that purpose, and then not over a limit prescribed, except for the erection of a courthouse or jail.

It would unduly swell the bounds of this opinion to take up, one at a time, the sections of the statutes and Constitution relied on pro and con, compare one with the other and expound all of them on an analysis of their clauses, terms and verbiage. The case does not call for it. We shall content ourselves with announcing our conclusions.

(a). In the first place, our present Constitution and laws mean that there came a time in the history of this State when the power (theretofore abused) to create a binding indebtedness upon a county in any one year beyond the revenue of that year levied for county purposes, was taken away from county courts—that is, in administering the business affairs of the county the "credit system" was abolished and the "cash system" was introduced—the latter, however, with flexibility and play enough to allow a county court in any one year to contract, by way of anticipation, with reference to the county revenue for that year. To this end it will be found that old statutes were modified and new enacted which, in connection with the old, were intended to present a complete and harmonious scheme for administering the affairs of the county, and at one and the same time put on foot and keep going the cash system.

Such public policy, evidenced by the whole body of our law, must be given effect through judicial construction; but judicial construction must not be so stumblingly narrow and literal as to paralyze a sensible administration of the business affairs of the county, if a liberal, practical and commonsense construction will avoid it. Mindful in that regard, we have looked in vain for any evidence tending to show that the acts complained of violated the public policy of this State in relation to the cash system, and we so rule.

(b). In the next place, from the statutory and constitutional enactments under review, it is plain that the system thereby established lopped away any inherent power of county courts to levy taxes for county purposes in excess of a dead level prescribed. We have been quite unable to see how the public policy thus outlined has been impinged upon, let alone violated, in aught, by the orders and doings of the respondents, and we so rule. The judges of the county court of Greene county have levied no taxes for county purposes in excess of their statutory and constitutional warrant of authority. Observe, the statutes charged them (not us) with a discretion in making estimates, and that discretion, absent fraud, when kept in the channel of the law, is not reviewable. Doubtless when the lawmaker or Constitution-maker intends that the discretion of a circuit or of an appellate court shall take the place of that now sensibly reposed in county courts of Missouri, in the matter of estimates for county purposes and tax levies within prescribed bounds, he will say so and make a mistake in saying it, as things now stand. Assuming for the present there was no fraud, it would be unseemly for us to either review or criticise the statutory discretion of the county court of Greene county in levying taxes. Doubtless (reminiscent) we may take judicial cognizance that Kickapoos, Delawares and Osages once pitch-

ed their wigwams and ranged up and down and to and fro in the pleasant mountains and valleys of the Ozark region—using trails instead of roads, and fords instead of bridges; that they had no salaried officers, no witness nor jury fees to pay, assumed no public care or burden for their poor or those who lost their mental reckoning, and (happily knowing nothing of "current expenses" or "contingent funds") lived, loved, hunted, fished, fought and died close to nature, free from the yoke of taxes, far from courthouses, jails and all other "pomp and circumstance" of civilization. So much is history, and courts know history. We may, peradventure, also know (without any proof whatsoever, and by the same token) that the red man went his way and the white man came at his heels; and, presently (speaking in recognizable figure), behold, the Happy Land of the Big Red Apple!—one flowing, maybe, with milk and honey! Withal, we may know as a court that the Pomme de Terre, the East Fork of Sac, the Asher, Clear, Pickerel, together with Wilson Creek, the James and its tributaries, meander and murmur within the spacious bounds of Greene. So much, we take it, is geography, and appellate courts know geography. But each and every one of these items of knowledge is *in nubibus* and of no value in deciding this case; for that in the present state of the law, we may *not* assume judicially to know the condition of the public roads of that county—whether founderous or not—or of the need of bridges for safe transit over the streams and rivers named, nor of the fees, official salaries, contingent expenses, the needs of the paupers and unfortunates, anent the local government of its people, nor the amount of taxes sufficient to meet such ends. Such knowledge is presumed to be with its county court, accordingly with that court the law wisely lodges the responsibility of its use and discretion in its application.

The premises considered, we hold that the trial court did not err in refusing an injuction against the tax levy of 1909 for county purposes, absent fraud—of which, later. Moreover, we know nothing of the allegations of the original bill. The amended bill was filed in November, 1909. The tax levy was long since made. That an injunction writ, the strong arm of equity, should arrest a whole tax levy so made, when it is conceded that the bulk of the taxes were properly laid, is not good equitable doctrine.

(c). Counsel argue at our bar that citizens of Greene deserve and demand a courthouse costing more than $100,000. We infer that, in some veiled way, this suit it is hoped will subserve such deserts and demands. In this connection something is made of the crudeness and plainness of the courthouse planned. But whether ornament in lieu of plainness in cornices—whether marble in columns, floors and stairways instead of concrete—shall be used in a public structure, is also a matter of discretion with county courts. No one may dispute about tastes. The line of the golden mean between mere use on one hand and the mere splendor of ostentation on the other, county courts must seek and chalk down for themselves. If they err in that behalf through design or taste there is a rustic assize to try and determine that issue *viz.*, a free electorate moving in its own good time to adjudicate the question and punish at the polls, applying the doctrine of *Mene, Mene, Tekel, Upharsin.* It may not be determined by a court of general jurisdiction proceeding according to the course of the common law. Hence, we decline to follow the lead suggested by the line of argumentation under review. The maxim is: It is the part of a wise judge to think so much only permitted to him, as is intrusted and committed to him, (*Sapientis judicis est,* etc.).

(d). The bill charges fraud in creating the courthouse fund and in making tax levies. We need not

dwell on that charge. It may be conceded to appellants that no county court could fraudulently divert funds from a lawful purpose, or to an unlawful purpose, or fraudulently make an excessive tax levy, or one to effectuate such unlawful purpose. Counsel cite cases announcing that doctrine. But we have no such case here. There is no testimony establishing fraud. If the county court misappropriated the funds on hand in February, 1909, by transferring any surplus to a new fund, it was at most a mistake in construing the law. There is no proof that the tax levies prior to 1909, or the levy of 1909, were made fraudulently. True, fraud causes all things to perish and courts will deal with it with bare hands, will pursue it and snatch away its fruits whenever found. True it is a fraud to conceal a fraud. It is furtive, elusive and hard to prove. Still it must be *proved*, for fraud is not presumed. It does not rest on conjecture or suspicion and, for anything appearing here, every penny of the tax levy of 1909 will be needed for purposes which appellants will concede are legitimate. Necessarily the needs of a growing and wealthy county like Greene may wax and wane from year to year, and the minds of its county judges may expand responsive to such growing and varying needs. To argue that the smaller levies of prior years created a surplus and, therefore, the greater levy of 1909 was either fraudulent, or excessive, knowingly made as bound to create a surplus, is a *non sequitur*. The point is ruled against appellants.

(e). It is not argued that the county court might not sell an antiquated, decaying or insufficient courthouse and the grounds on which it stood, which latter may have become a poor location therefor, and devote the proceeds to new grounds and a new building. Appellants ask no relief on that score or by virtue of the fact that the order of the sale has been consummated and the money placed in the public chest as a

part of a courthouse fund. But it is stoutly argued that the $50,000 of surplus funds, the odds and ends of the old tax levies and back taxes, could not be legally transferred to such courthouse fund, and such transfer should be enjoined.

This is the main question in the case. To it we pass.

(f). Learned counsel for appellants maintain that there were only three ways to create a fund for building a courthouse—one, a sale of bonds voted by the people; another, by direct tax voted by the people—both as provided by the Constitution; the other, a petition by the prosecuting attorney and the county court to the circuit court and an order by that court adjudging the levy necessary and lawful under the Cottey Act. *Contra,* counsel for the respondents maintain that there is still another legal way, *viz.,* under the provisions of Revised Statutes 1899, sections 6723 to 6729 inclusive, supra, the provisions of which we have hereinbefore set forth. They say that if the county has the money it need not borrow or levy special taxes by a vote of the people, but may act sensibly by using its funds on hand for such legitimate county purpose. At this point counsel cross swords on another proposition, *viz.:* Respondents go a step further and say that surpluses, not used or needed for the purpose for which the funds were apportioned and appropriated by the county court from year to year, may be gathered into a courthouse fund and such aggregation may be construed as the "sufficient funds in the county treasury for that purpose" mentioned in section 6723. Counsel for appellants deny that. They say that such funds are "sacred" and must be carried forward from year to year to be used as originally appropriated so that the so-called surplus should be used to reduce the current tax levy for county purposes and not for building a courthouse. In this connection by virtue of diverse interpretations, both

sides confidently rely on the statutes relating to the transfer of funds, *viz.*, sections 1923, 6794 and 6795, the provisions of which have also been set forth.

We shall not write the law so that county courts may make excessive levies for county purposes for the very purpose of evading the statutes and creating a surplus to build a courthouse, thereby, under the seeming forms of law, evading the spirit and intent of the law. We have already disposed of the features of this case in that particular, and shall proceed to determine the question now up by assuming that the levies were honestly made from year to year, and that the surpluses were honestly accumulated as indicated.

The bald question then is: May a county court transfer a surplus and divert it from a fund, having a designated and given purpose, to another legitimate county purpose, by force and reason of the satisfaction of the original use or purpose? We answer that question in the affirmative. We are of the opinion that the force of the Cottey Act is spent in another direction, as the history of the times of its enactment well shows, and that it ought not to be construed as prohibiting such transfer of funds. We are further of the opinion that the various statutes providing for the transfer of funds, when practically construed, lend substance and countenance to the view we have expressed. We are further of the opinion that sections 6723 to 6729 inclusive, supra, now a part of article 2 of chapter 97, entitled "Counties", is a live law though old. The chapter and article have been revised and amended from time to time and brought down for every day use. The Cottey Act was not intended to repeal it and the provisions of the two are not antagonistic or inconsistent. Repeals by implication are not favored. It is our duty to harmonize and preserve the whole body of the law, when we can. We are further of the opinion that when all warrants and debts properly chargeable to a fund in any one year

are paid and provided for, the residue of such fund is a "surplus" within the purview of the transfer sections. Is not the building of a courthouse as legitimate as any other county purpose? Are bonds so desirable that the people of a Missouri county must bond themselves when bonds are not necessary, or go without a courthouse? Must they levy special taxes when they have the means in the treasury to avoid such special levy? Running like a thread through the statutes is the idea of as low a rate of taxation as is compatible with the welfare of the people, and the other idea that the county's business must be done for cash. All these ideas are conserved by the holding made,

This opinion is now too long and we will not extend it by quotations from decisions, but content ourselves by pointing to certain cases, collated by counsel, which sustain one or the other of the propositions ruled—at least *arguendo*. The curious are referred to them, *viz.*: Anderson v. Ripley County, 181 Mo. 46; State ex rel. v. Appleby, 136 Mo. 408; State ex rel. v. Cottengin, 172 Mo. 129; State ex rel. v. Johnson, 162 Mo. 621; Book v. Earl, 87 Mo. 246; Andrew Co, v. Schell, 135 Mo. 31; Vitt v. Owens, 42 Mo. 512; State ex rel. v. Howell Co. Ct., 58 Mo. 583; State ex rel. v. Payne, 151 Mo. 663; State ex rel. v. Railroad, 101 Mo. 136; State ex rel. v. Bollinger, 219 Mo. 204.

We have not overlooked the orders of April and August retransferring some of the courthouse funds back to the original funds. Those orders were passed because of a temporary lack of funds to pay *current* bills chargeable, primarily, against the revenue of 1909. Whether they were properly made or not, we need not inquire; for, either way, they have nothing to do with the legality of the courthouse fund under the views we have expressed in this opinion.

The case was tried without error below. Let the judgment be affirmed. It is so ordered. All concur, except *Burgess, J.,* not sitting.