Joyce REED, Plaintiff-Respondent,

v.

SALE MEMORIAL HOSPITAL AND CLINIC, a partnership, composed of P.B. Anderson, Richard Betz, Robert F. Betz, G.W. Blankenship, J.R. Carter, W.D. Dabbs, Roy E. Kenney, H.C. Lentz and G.C. Olive, and P.B. Anderson, Richard Betz, Robert F. Betz, G.W. Blankenship, J.R. Carter, W.D. Dabbs, Roy E. Kenney, H.C. Lentz, and G.C. Olive, all individually, Defendants-Appellants.

No. 13376.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 23, 1985.

Motion for Rehearing or Transfer Denied Oct. 15, 1985.

Application to Transfer Denied Nov. 21, 1985.

John Sims, Ruyle, Sims & Lampo, Neosho, Karl W. Blanchard, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for defendants-appellants.

L.R. Buehner, Buehner & Buehner, Joplin, Kenneth H. Reid, Turner, Reid, Duncan, Loomer & Patton, Springfield, for plaintiff-respondent.

HOGAN, Presiding Judge.

Plaintiff Joyce Reed was employed as a medical records clerk by the Sale Memorial Hospital and Clinic, a hospital operated by the individual defendants as a partnership. While she was so employed, plaintiff sustained an injury compensable under the provisions of the Workers' Compensation Law, Chapter 287, RSMo 1978. She was summarily discharged from employment September 29, 1976. Thereafter plaintiff brought this statutory action for wrongful discharge as a result of her exercise of her rights under the Workers' Compensation Law. Section 287.780, RSMo 1978. A jury awarded plaintiff $22,500 in actual damages and $245,000 in punitive damages. The defendants appeal. They have meticulously briefed and argued 17 discrete assignments of error. We shall nevertheless consider only those points essential and necessary to an orderly disposition of the appeal. See *Bloomfield Reorganized School Dist. No. R–14 v. Stites,* 336 S.W.2d 95, 97 (Mo.1960); *Southwest Engineering Co. v. Reorganized School District R–9,* 434 S.W.2d 743, 746 (Mo.App.1968). We reverse and remand.

Because trial errors are generally immaterial if plaintiff made no submissible case, *Osborn v. McBride,* 400 S.W.2d 185, 188[1] (Mo.1966); *Wilkerson v. State Farm Mutual Automobile Ins. Co.,* 510 S.W.2d 50, 52 (Mo.App.1974), we must first consider the sufficiency of the evidence to support the judgment. In determining submissibility, we are firmly held and bound by the decision of our Supreme Court in *Hansome v. Northwestern Cooperage Company,* 679 S.W.2d 273 (Mo. banc 1984). *Han-*

*some* was decided after this case was tried, but the court did not indicate that the decision was to be applied only prospectively. Therefore, and because the decision establishes a new substantive rule of law—the elements of a plaintiff's case in an action brought under § 287.780—*Hansome* must be given both retrospective and prospective application. *State v. Walker,* 616 S.W.2d 48, 49 (Mo. banc 1981); *Dietz v. Humphreys,* 507 S.W.2d 389, 392 (Mo.1974). Without fixing the burden of proof, the court held in *Hansome* that the action created by § 287.780 has four elements: (1) plaintiff's status as an employee of defendant before injury; (2) plaintiff's exercise of a right granted by Chapter 287; (3) the employer's discharge of or discrimination against plaintiff, and (4) an exclusive causal relationship between the plaintiff's actions and defendant's actions. *Hansome,* 679 S.W.2d at 275. Nevertheless in determining submissibility, this court considers the evidence in the light most favorable to the plaintiff, giving plaintiff the benefit of all inferences reasonably to be drawn from the evidence and disregarding defendants' evidence which does not support the plaintiff's case. *Hansome,* 679 S.W.2d at 274; *Henderson v. St. Louis Housing Authority,* 605 S.W.2d 800, 803 (Mo.App.1979).

So taken and considered, plaintiff's testimony establishes that she was employed by the defendant hospital on March 12 or 13, 1973. Basically, she did clerical work. She sustained a compensable injury on January 24, 1975, when she fell over a waste basket. Plaintiff sustained a head injury and also sustained some injury to her right knee and her left arm. She was given immediate treatment by Dr. Richard Betz, one of the partners who operated the hospital. The physicians by whom she was employed referred plaintiff to a Joplin physician, but later Dr. H.C. Lentz, another partner, treated her for the injuries she had sustained. Plaintiff continued consulting Dr. Lentz up to a month or so before she was discharged.

Immediately after the plaintiff was injured, she was off work four to five weeks. Thereafter, except for a brief period in January 1976, plaintiff continued to work at the hospital. Plaintiff testified that she worked continuously at the hospital up to the time she was fired. She received no reports from her immediate supervisor or the physicians that other employees had complained about her or her work, and nobody warned her about the quality of her performance on the job. She "[got] every raise that was available during [her] entire time ... at the hospital." The fact that plaintiff received pay raises when they were granted to other employees was confirmed by Mrs. Naydene Belka, Assistant Administrator and Superintendent of the hospital.

In early May 1976, plaintiff met with one Dean Johnston, who represented the employer's insurer. Mr. Johnston offered plaintiff $2,500 to settle her compensation claim. Plaintiff was "still hurting" so she decided to consult Dr. G.W. Blankenship. Dr. Blankenship, 70 years of age, "supervised the operation of the hospital and clinic." He stated he was the "chief executive officer, I guess, would be the proper title." He also testified Mrs. Naydene Belka "had charge of the administrative chores" from day to day, but Dr. Blankenship had been "in charge" for more than 20 years before he gave up that job in 1983. The doctor was also president of the corporation which owned the hospital. Medical treatment and some compensation had been routinely furnished by the employer upon a report of injury. No formal claim for compensation had been filed. So, the plaintiff, "still hurting and still injured," consulted Dr. Blankenship about Mr. Johnston's settlement offer and made a "settlement proposition" of her own. Dr. Blankenship's advice was if plaintiff didn't quit complaining, people were going to think she was neurotic. Plaintiff also spoke to Dr. P.B. Anderson about her claim, but he offered no advice.

The insurer was as dissatisfied as the plaintiff with the lack of progress being made toward a final discharge of defendants' liability, and as a consequence requested an informal conference with the Referee. The conference requested was a

pre-hearing conference. Plaintiff decided to consult an attorney. Her attorney advised her she was not required to attend the conference, and also advised her to file a formal claim for compensation. As the date for the conference approached, Mrs. Rhames, plaintiff's immediate supervisor, told plaintiff the conference was scheduled for 9:30 a.m. on September 28, 1976, and plaintiff need not report for work on that day, but could report for the conference and then come to work. Plaintiff called her attorney again to see if she was required to attend the conference. She was again advised she was not. Plaintiff went to work early on the morning of September 28 and told Mrs. Belka she was not going to attend the conference, that she had filed a claim for compensation and had been advised that she need not go. Plaintiff worked all day on September 29. September 30 was plaintiff's day off. On September 30, plaintiff received a telephone call from Mrs. Belka, which she repeated as follows:

> "She said that Dr. Blankenship had told her to inform me that I had been terminated as of five o'clock the evening before *and Dr. Blankenship said I should have attended the meeting, and that the medical staff had met and now they had no choice.*" (Emphasis added.)

Such, in substance, is the evidence upon which the plaintiff was obliged to rely. Evidentiary detail will be noted when necessary.

### I

### (A)

■ The first aspect of submissibility with which we must concern ourselves is whether the evidence is sufficient to warrant the finding of "causality" which was held to be essential in *Hansome,* 679 S.W.2d at 275 and n. 2. Proof that an employee was discharged solely in consequence of his exercise of some "right" under the Workers' Compensation Law is necessarily indirectly made because ordinarily, the employer is not likely to announce retaliation as his motive. Of course, as we

see in this case, the plaintiff may show an express declaration of an actual retaliatory motive for the discharge. Such evidence is very persuasive. L. Larson & P. Borowsky, Unjust Dismissal § 6.05[5]. Other factors to be considered are the proximity in time between the exercise of the right and the time of the firing, coupled with evidence of satisfactory work performance and supervisory evaluations. *Axel v. Duffy-Mott Co., Inc.,* 47 N.Y.2d 1, 416 N.Y. S.2d 554, 389 N.E.2d 1075 (1979); L. Larson & P. Borowsky, op. cit. § 6.05[5] ). These general principles are reflected in this jurisdiction. In some cases there has been an express declaration of a retaliatory motive; in *Mitchell v. St. Louis County,* 575 S.W.2d 813 (Mo.App.1978), causality was in part negatived by the fact that the plaintiff was discharged many months after she filed a claim for compensation; in *Davis v. Richmond Special Road District,* 649 S.W.2d 252 (Mo.App.1983), there was a legitimate non-pretextual reason for the plaintiff's discharge—physical inability to do the job—so, satisfactory performance on the job could not be shown as an element of the plaintiff's case.

■ In the case at hand, undoubtedly the most persuasive evidence was defendants' declaration of retaliatory purpose. Of course a jury was not bound to accept plaintiff's statement but it was at liberty to do so. Further, in the view of this court, there is other evidence of a retaliatory motive. Dr. Blankenship testified that the plaintiff had complained of the order of medical attention she received as treatment for her injuries; the physicians who operated the hospital considered this to be "disloyalty." Plaintiff was asked if, at any time any of the physicians indicated that they "bore [her] any malice or ill-will." Plaintiff answered "No." It is one matter for a physician to resent a patient's criticism; it is quite another to communicate that resentment outright to the patient who, in this case, was an employee. Contrary to defendants' assertion, the "disloyalty" of which Blankenship spoke could, without stretching the jury's imagination,

have been found to be masked resentment which caused her employers to be "looking for an excuse" to fire the plaintiff. The existence of animus was for the jury.

In addition, there was testimony from which a jury could draw the inference that plaintiff's work performance was satisfactory and that if she had been given negative supervisory evaluation, that evaluation had not been communicated to her. Both the plaintiff and Mrs. Belka testified that during the term of her employment, the plaintiff received regular salary increases. Dr. Blankenship testified that the defendant hospital employed 180 to 190 employees during the time plaintiff was working there. It is inconceivable that an establishment of this size would not maintain personnel files and equally inconceivable that periodic evaluations were not made, but despite the evidence adduced by the defendants tending to show plaintiff was an unsatisfactory employee, there was absolutely no documentation whatever to support Mrs. Belka's oral assertions that complaints about the plaintiff's job performance were frequent. In sum, allowing for the elusiveness of proof of retaliatory intent, the inferences from the evidence permitted a finding that plaintiff's discharge was in retaliation for her pursuit of her compensation claim.

### (B)

Two other complaints touching the sufficiency of the evidence should be briefly discussed. In connection with the verdict-director, defendants maintain that the instruction should have submitted that defendants knew plaintiff had filed a claim for compensation and that she failed to attend the scheduled conference; the same point is repetitively made as subpoint G of point II. The defendants suggest that proof of a retaliatory motive cannot be supplied by indirect evidence or inference, citing *Davis v. Richmond Special Road District*, 649 S.W.2d 252. We are in doubt that our colleagues at Kansas City meant to go further than to say that a retaliatory discharge could not be inferred from the fact that an employee had once exercised some right under the Workers' Compensation Law and was thereafter discharged. In any event it was clearly held in *Hansome* that a plaintiff in this statutory action is entitled to the benefit of all inferences reasonably to be drawn from the evidence. *Hansome*, 679 S.W.2d at 274[1].

The defendants would have it that they must have actually been served with the formal claim for compensation and that it was necessary for the plaintiff to show directly that Dr. Blankenship had knowledge that plaintiff did not attend the settlement conference. Imposing such a burden on the plaintiff would effectively nullify the statute. As we have already recited, the defendants' insurer had made an offer of settlement to the plaintiff; plaintiff in turn had suggested a settlement to Dr. Blankenship. Both offers had been rejected by the offeree. The Division's own regulation, 8 CSR 50–2.010(15), requires that the *parties* be notified as to the exact date, place and hour of the setting at least ten (10) days prior to hearing or the pre-hearing conference date. The fact that the notice of formal claim did not reach the employer by the time plaintiff was discharged is not dispositive—"the claim was imminent." *Hansome*, 679 S.W.2d at 277 (Blackmar, J., concurring). The defendants had enough knowledge to advise them, even as laymen, that they were being "taken to court" so to speak, by the plaintiff. The proximity of the employer's action to the plaintiff's decision to make a claim and to refuse further efforts to negotiate is some indication of a retaliatory motive. Otherwise, this court is not required to determine the mental process by which the jury could have reached its conclusion; it is only obliged to determine that there was evidence from which such conclusion could have been reached by a jury composed of reasonable men and women. *Vosburg v. Smith*, 272 S.W.2d 297, 303–4[16–18] (Mo. App.1954); cf. *Jackson v. Virginia*, 443 U.S. 307, 320, n. 13, 99 S.Ct. 2781, 2789, n. 13, 61 L.Ed.2d 560, 586, n. 13 (1979), reh'g denied 444 U.S. 890, 100 S.Ct. 195, 62

L.Ed.2d 126 (1979). The evidence was sufficient to support the submission.

## II

The defendants have briefed and argued eight more or less distinct assignments of instructional error. Assignments B, F and G are repetitive contentions that the evidence was not sufficient to support the verdict. Those arguments have already been considered. The remaining assignments which must be considered are: (1) that plaintiff's Instruction No. 5—her verdict-director—is erroneous because it alternatively submits a single theory of recovery in the conjunctive and in the disjunctive, and (2) that the instruction purports to hypothesize an abstract question of law to the jury rather than the disputed factual issues, as was the case with the verdict-director in *Henderson v. St. Louis Housing Authority*, 605 S.W.2d at 803–4[8, 9]. Otherwise, the defendants contend that the instruction is argumentative in several respects, but in the view we take of this appeal it is unnecessary and would be imprudent to consider and resolve those contentions. The defendants also maintain that plaintiff's Instruction No. 7, which is MAI 10.03, is improper in form.

### (A)

Instruction No. 5 purports to direct a verdict for the plaintiff; it is a "not-in-MAI" instruction which reads as follows:

"Your verdict must be for the plaintiff if you believe:

First, that plaintiff, while employed by the defendants, exercised certain of her rights under the Worker's Compensation Law by filing a Claim for Compensation and failing to attend the Conference scheduled on September 28, 1976, and

Second, as a direct result of plaintiff exercising said rights, or either of them, under the Worker's Compensation Law, defendants discharged plaintiff, and

Third, as a direct result of such discharge plaintiff sustained damage."

The challenge to this instruction on the ground that it submits questions of law for the court rather than ultimate facts for the jury is ill taken. In *Henderson v. St. Louis Housing Authority*, 605 S.W.2d at 803, the case to which defendants compare this action, plaintiff hypothesized only that "plaintiff exercised his rights under the workmen's compensation law of Missouri." Our colleagues at St. Louis quite properly held that the verdict-director was too general, broader than the pleadings and proof and amounted to a roving commission because it permitted the jury to speculate what right plaintiff exercised.

The instruction before us does not have that vice. It hypothesizes ultimate facts, not abstract statements of law. Verdict-directing instructions nowadays should submit only the ultimate issues and evidentiary detail should be left to the jury. *Doolin v. Swain*, 524 S.W.2d 877, 881–82 (Mo. banc 1975). Thus it was held in *Glastris v. Union Electric Company*, 542 S.W.2d 65, 71 (Mo.App.1976), to be error to submit the defendant's liability upon the evidentiary facts rather than the ultimate fact of negligently maintaining a condition that was an unreasonable risk to the plaintiff. Further, it was stated in *Zipp v. Gasen's Drug Stores, Inc.*, 449 S.W.2d 612, 617[3, 4] (Mo.1970), that:

"The clear purpose of the new method of instructing juries, adopted by Supreme Court Rules 70.01 and 70.02, V.A. M.R., effective January 1, 1965, *was to submit ultimate issues, not evidentiary details*. This is an instruction not found in M.A.I. Plaintiff, in drafting the instruction, was subject to the requirement that the instruction submit only the ultimate factual issues, be within the general scope of the pleadings, not assume issuable facts, and be understandable by a reasonably intelligent jury. *Price v. Seidler*, Mo.Sup., 408 S.W.2d 815, 823–824[15], [16–18] [1966]."

Plaintiff's Instruction No. 5 is not prejudicially erroneous as submitting questions of law to the jury. The instruction found erroneous in *Henderson*, 605 S.W.2d at 803, was supplemented in this case by an

hypothesis of ultimate fact, specifically that plaintiff filed a claim for compensation and failed to attend a scheduled conference. As plaintiff undoubtedly had these "rights," no prejudice resulted from submitting her acts as such. It *might* have been better to refer, in paragraph Second, to the ultimate facts hypothesized in paragraph First, rather than to predicate defendants' liability on "plaintiff's exercising such rights" but we believe a jury composed of reasonably intelligent men and women would understand that the phrase "plaintiff exercising such rights" referred to the ultimate issues hypothesized in paragraph First.

(B)

Defendants' have briefed a further objection to the form of Instruction No. 5. In their assignment of error No. II defendants assert that plaintiff purported to submit a single theory of recovery in paragraph First and then switched to the disjunctive in paragraph Second, which, defendants say, is prohibited by MAI 1.02 which in terms proscribes the submission of dual or multiple theories of defense or recovery in the conjunctive. As to paragraph Second, we agree that a jury of reasonably intelligent men and women might conclude from the direction of the court that they could find for the plaintiff if they found that plaintiff either filed a claim for compensation or refused to attend the settlement conference.

▬▬▬ The court is obliged to agree that paragraph First submits dual theories of recovery in the conjunctive. Plaintiff's claim did not have several elements; the statute refers to "any right" under the Workers' Compensation Law. All the same, the instruction must be read as a whole. In our view, paragraphs First and Second, read together, permit recovery disjunctively if the jury found that plaintiff exercised either or both of the rights hypothesized in paragraph First. In short, Instruction No. 5, taken as a whole, does not submit two alternative independent hypotheses, as did the instruction held errone-

ous in *Strickland v. Barker,* 436 S.W.2d 37, 41 (Mo.1969); rather it permits a recovery upon either of two alternative (disjunctive) findings, which is permissible if there is support in the record for each disjunctive hypothesis. *McCoy v. Hershey Chocolate Co.,* 655 S.W.2d 128, 130[1] (Mo.App.1983); *Johnson v. Bush,* 418 S.W.2d 601, 606[7–10] (Mo.App.1967). Because we have held that the record supported both hypotheses, the instruction was not prejudicially erroneous. We are guided by the principles that an instruction is not to be condemned merely because it is susceptible of differing constructions, *Deskin v. Brewer,* 590 S.W.2d 392, 400–1 (Mo.App.1979), and that it is not enough to show erroneous deviation from MAI unless prejudice also appears. *Hudson v. Carr,* 668 S.W.2d 68, 71[3] (Mo. banc 1984).

(C)

▬▬▬ The defendants further argue that Instruction No. 5 does not put the defendants' knowledge of the plaintiff's action directly before the jury. The argument is unsound. It is the rule that no essential element of a plaintiff's verdict-director may be omitted, but an instruction is not erroneous when a finding of the essential element is necessarily implied from the other findings required. *Gathright v. Pendegraft,* 433 S.W.2d 299, 311 (Mo.1968); *Heppner v. Atchison, Topeka and Santa Fe R. Co.,* 297 S.W.2d 497, 505 (Mo.1956); *Schonlau v. Terminal R. Ass'n of St. Louis,* 357 Mo. 1108, 1116–17, 212 S.W.2d 420, 424–25[9] (1948); *Messing v. Judge & Dolph Drug Co.,* 322 Mo. 901, 923–25, 18 S.W.2d 408, 418[8] (1929). The discharge of an employee as retaliation or for any other reason is a *volitional* act. It would be logically impossible for a jury to find that defendants discharged the plaintiff "as a direct result" of her exercise of her "rights" without also impliedly finding that defendants knew she had exercised her "rights." The instruction is not defective because it does not explicitly require the jury to find defendants knew plaintiff had

filed a claim for compensation and had failed to attend the conference.

### (D)

Two other assignments of instructional error may be mentioned briefly. Defendants maintain that Instruction No. 7, which is MAI 10.03, appropriately modified, incorrectly states the law. This is not the court to which to argue that complaint. The defendants also maintain that Instruction No. 5 was prejudicially erroneous because it hypothesized conceded facts. Under MAI practice, an instruction should not hypothesize conceded facts, but requiring a finding of conceded facts in no way prejudiced the defendants in this case. See *Terry v. Sweeney*, 420 S.W.2d 368, 376[8] (Mo. App.1967). To have done with the complaints of instructional error, we should make it clear that we do not approve Instruction No. 5; it could easily have been improved, but we perceive no prejudicial error on any ground briefed or argued in this court.

### III

Another assignment of error which must be discussed is defendants' contention that punitive damages should not have been submitted against any defendant except defendant Blankenship because no other member of the partnership knew of or ratified Blankenship's termination of plaintiff's employment or authorized or ratified that act. We are cited to cases from other jurisdictions and to *Oster v. Kribs Ford, Inc.*, 660 S.W.2d 348 (Mo.App.1983).

The dispositive question is whether the discharge was within Blankenship's agency as general agent for the other physicians. Generally, and on principles of mutual agency, the partnership and each member, is liable for torts committed by one of the members acting within the scope of the firm business, although they do not participate in, ratify or have knowledge of such torts. *Martin v. Yeoham*, 419 S.W.2d 937, 951 (Mo.App.1967). The court there stated:

" '[T]he true test is not the illegality or the malicious and willful character of the wrong, but whether it was done within the scope of the wrongdoing partner's authority; and such determination must necessarily rest on the facts of the particular case....' "
Id. at 951.

The parties have cited a number of cases involving partnership liability for assault, and we suppose those cases have some bearing on the point. However, in our view, the precedents dealing with partnership liability for fraud are more nearly analogous to the situation at hand. In *Martin v. Barbour*, 558 S.W.2d 200 (Mo. App.1977), the defendant physician's liability for malpractice was based in part on his fraudulent concealment of the probability that he had irreparably damaged the plaintiff's anal sphincter. Defendant's partner, also a physician, maintained that the fraud feasor's intent could not be imputed to him. The court held:

" 'The individual partners * * * are liable in a civil action for the fraudulent misconduct of a partner within the course or scope of the transactions and business of the partnership, whether such misconduct be by fraudulent representations or otherwise, even though the copartners had no knowledge of the fraud and did not participate therein; * * *' "

Id. at 209; *Kearns v. Sparks*, 260 S.W.2d 353, 360[15] (Mo.App.1953). Other precedents from other jurisdictions might be cited, but the cases just noted are sufficient to convince this court that all the partners are liable to the plaintiff for punitive damages if Dr. Blankenship was acting within the scope of his agency. Blankenship himself testified to his agency and Dr. Anderson's testimony established that the scope of Blankenship's authority extended to discharging employees. There is no merit in the point.

### IV

By their assignments of error Nos. IV and V, the defendants have advanced an

elaborate inductive argument that punitive damages should not be allowed in an action brought under § 287.780. The argument is for the most part that an action under § 287.780 should be considered as a contract action, not a tort action, and therefore punitive damages are inappropriate. We are cited to *Otto v. Imperial Casualty and Indemnity Company*, 277 F.2d 889 (8th Cir.1960), among other precedents.

We are not convinced that exemplary damages should not be allowed in retaliatory discharge cases brought under § 287.780. We agree that our Supreme Court has not joined in the flush of enthusiasm shown in some jurisdictions and by some commentators for "wrongful discharge" actions.[1] In *Dake v. Tuell*, 687 S.W.2d 191 (Mo. banc 1985), that court unequivocally held:

> "Under Missouri's employment at will doctrine an employer can discharge ... an at will employee who does not otherwise fall within the protective reach of a contrary statutory provision and still not be subject to liability for wrongful discharge." (Citations omitted.)

Id. at 193. However, it is clear that our Supreme Court regards § 287.780 as an exception to this general rule. *Hansome*, 679 S.W.2d at 275, n. 2. Further, an examination of the cases construing former § 287.780, which was the law from 1925 to 1971, and particularly *Christy v. Petrus*, 365 Mo. 1187, 295 S.W.2d 122 (1956), leaves little doubt that the "evil to be remedied" was the want of an effective remedy for retaliatory discharge arising out of the exercise of rights granted by Chapter 537. In short, § 287.780 declares "public policy," and it is therefore our duty to "construe

the law as to further the remedy and retard the evil." *Decker v. Deimer*, 229 Mo. 296, 324, 129 S.W. 936, 944[4] (1910); Crawford, Statutory Construction § 161, pp. 247–48 (1940).

■ One of the bases for recognition of a "common law" right to recovery was the inadequacy of the remedy afforded by criminal statutes which prohibited employers from interfering with their employees' exercise of their rights under the Workers' Compensation Law. See *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 359 (1979); *Lally v. Copygraphics*, 173 N.J.Super. 162, 413 A.2d 960, 969 (1980). Although the cases are not in accord, we conclude that § 287.780 created a judicially cognizable independent tort, and that when the employer's actions warrant it, an award of punitive damages may be made. To a greater or lesser degree, the precedents cited marginally support this view.[2]

## V

The final assignment of error which requires consideration is defendants' argument that the trial court erred in admitting the testimony of witness Helen Larson in rebuttal for the purpose of rehabilitating the plaintiff. This point is well taken and requires reversal, even though the plaintiff vigorously argues that the evidence was properly received because the plaintiff had been impeached and her character had been put in issue.

A key element of plaintiff's case—causality—was effectively supplied by her testimony that on September 30, 1976, Mrs. Belka called her and advised her she had

---

1. See, generally, J. Krauskopf, Employment Discharge: Survey and Critique of the Modern At Will Rule, 51 UMKC L.Rev. 189 (1983); Comment, Employment at Will: When Must An Employer Have Good Cause For Discharging An Employee?, 48 Mo.L.Rev. 113 (1983).

2. *Raden v. City of Azusa*, 97 Cal.App.3d 336, 158 Cal.Rptr. 689, 695, n. 6 (1979) (dictum); *Kelsay v. Motorola*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d at 360 (decision made prospective only); *Garrison v. Industrial Commission*, 83 Ill.2d 375, 47 Ill.Dec. 347, 349, 415 N.E.2d 352, 354[4]

(1980) (action for retaliatory discharge an independent tort); *Scott v. Union Tank Car Co.*, 402 N.E.2d 992, 993 (Ind.App.1980); *Murphy v. City of Topeka-Shawnee Cty. Department of Labor Services*, 6 Kan.App.2d 488, 630 P.2d 186, 192–93[10] (1981) (decision made prospective only); *Lally v. Copygraphics*, 173 N.J.Super. 162, 413 A.2d at 969; *Hansen v. Harrah's*, 675 P.2d 394, 397[7] (Nev.1984) (decision made prospective only); *Carnation Company v. Borner*, 610 S.W.2d 450, 454–55 (Tex.1980) (under statute).

been discharged. Plaintiff was carefully instructed to "Say what [Mrs. Belka] said." Plaintiff replied: "She said that Dr. Blankenship had told her to inform me that I had been terminated as of five o'clock the evening before and Dr. Blankenship said I should have attended the meeting, and that the medical staff had met and now they had no choice."

Mrs. Belka was then called as a witness by the plaintiff. Apparently to counsel's surprise, she contradicted the plaintiff's testimony just quoted and contradicted her own depositional testimony in several respects. Mrs. Belka did admit that upon her deposition, she had been unable to remember some of the matters to which she testified positively on trial. Plaintiff was also flatly contradicted concerning the nature and content of the telephone call by Dr. Blankenship, who testified as a witness in behalf of the partnership. As plaintiff suggests, some of the defendants' witnesses suggested that plaintiff had "taken things" and her habit of doing so was the reason for her discharge.

On rebuttal, plaintiff was allowed over objection to ask Helen Larson, who was a former secretary for plaintiff's counsel, if plaintiff had called her on September 30, 1976, to advise Mrs. Larson that "... Naydene Belka had called her about eleven, fifteen that morning and told her she should have gone to a conference, and that the doctors had, the doctors had told Naydene Belka she would have to inform [the plaintiff] as regards her attending the conference. The Doctors also said she should attend the conference." Witness Larson testified from a shorthand memorandum, but stated she had an independent recollection of the conversation.

The defendants argue broadly that a majority of all jurisdictions, including Missouri, hold that a witness who has been contradicted has not been impeached; therefore, there was no reason to rehabilitate the plaintiff. There is authority that "contradiction" is not synonymous with "impeachment." Impeachment is directed to the witness for the purpose of discrediting him.

Contradiction, on the other hand, is directed to the accuracy of his testimony. *Talley v. Richart*, 353 Mo. 912, 917–18, 185 S.W.2d 23, 26 (1945). And, there is authority that until a witness' credibility has been attacked, rehabilitation is premature. *State v. Christian*, 570 S.W.2d 819, 820[1, 2] (Mo.App.1978); Hasl and O'Brien, Missouri Law of Evidence § 5.4, p. 43 (1984). However, contradiction is sometimes referred to as a method of impeachment. *State v. Swisher*, 364 Mo. 157, 161–62, 260 S.W.2d 6, 10 (banc 1953); McCormick, Evidence § 47, p. 97 (2d ed. 1972). We need not resolve the question whether in all contexts, "contradiction" is the equivalent of "impeachment."

■ The error here is that what plaintiff said was not in issue; what Mrs. Belka said was. What the plaintiff offered was a statement made by the plaintiff to a third person; we have no doubt of Mrs. Larson's accurate recollection, but Mrs. Belka at no time spoke to Mrs. Larson. The elementary rule which was violated is that a witness' testimony cannot be bolstered by hearsay evidence. *Wilson v. Miss Hulling's Cafeterias*, 360 Mo. 559, 570, 229 S.W.2d 556, 562 (1950). Further, the statement was self-serving, as the defendants argue. If the tenor of Mrs. Belka's statement were not so important to the plaintiff's case, this court might conclude the error was harmless. It is otherwise, and the cause must be reversed for the admission of Mrs. Larson's testimony.

## VI

Other points have been briefed and argued. Because a retrial of this cause may not follow the same pattern as this trial, those points will not be considered. The judgment is reversed and the cause is remanded.

PREWITT, C.J., and CROW, J., concurs.

MAUS, J., recuses.