**John R. RALPH, Plaintiff–Respondent,**

v.

**LEWIS BROTHERS BAKERIES, INC., Defendant–Appellant.**

No. 22182.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 29, 1998.

A.M. Spradling, III, Spradling & Spradling, Cape Girardeau, for appellant.

Jim S. Green, Jim S. Green, P.C., Sikeston, for Respondent.

SHRUM, Presiding Judge.

A jury awarded John R. Ralph (Plaintiff) damages on his claim of retaliatory discharge from employment with Lewis Brothers Bakeries, Inc. (Employer). Employer's appeal presents these issues:

1. Is there sufficient substantial evidence to support a finding that Plaintiff's filing of a workers' compensation claim was the exclusive cause for his discharge?

2. Is a new trial or remittitur mandated on the theory that the damage award was excessive because it included lost wages and benefits *after* the date the Social Security Administration adjudged Plaintiff to be totally disabled?

We answer yes to the first question and no to the second.

We affirm.

### FACTS

Employer operates a bakery located in Sikeston, Missouri. Plaintiff started to work there in June 1986 and was fired in 1991. Later in this opinion we detail the conflicting evidence regarding Plaintiff's discharge.

No dispute exists, however, that chronologically Plaintiff's discharge came after he filed a workers' compensation claim based on a carpel tunnel syndrome injury to both hands. Plaintiff's position was that his injuries stemmed from repetitive hand and arm movements involved in working as a "pan-o-mat" tailer. This job required that the "tailer" remove bread pans from a "pan-o-mat" conveyor and put them on carts.

Plaintiff first told his foreman of a problem with his hands on June 29, 1990. He asked for someone to take over his job and left work to seek medical attention. The first physician who saw Plaintiff, Dr. Tellow, diagnosed him with carpal tunnel syndrome in both arms. That same day, Plaintiff took Dr. Tellow's reports and a work excuse to Employer's vice-president and plant manager, Gary Houchins (Houchins).

Later, on July 9, 1990, Dr. Tellow wrote a report to the effect that Plaintiff's carpal tunnel injuries were work related. Plaintiff gave that report to Houchins and told him he "wanted to file a worker's comp claim." Houchins responded "that he didn't believe my job caused my injuries.... [T]hat riding my motorcycle probably was the cause of my injuries and that I should file it under my health insurance." Plaintiff answered that "my health insurance was for when I got hurt at home, and this was an injury at work and I had to file it under my worker's comp insurance...."

Plaintiff testified that Employer did not notify the workers' compensation division of his injury "for a couple months, and ... when they did file it, they had backdated the injury report." Plaintiff insisted that he knew the form was backdated "[b]ecause I had to file failure to report an injury on the [Employer] because they wouldn't file the injury and the worker's compensation people sent me a document that says so, that as of a couple weeks after this date they didn't have [the report of injury form.]" Ultimately, Plaintiff filed a claim against Employer for workers' compensation benefits on August 22, 1990.

Plaintiff was still off work because of his injuries when Dr. Tellow referred Plaintiff to a "hand surgeon, [Dr.] Ricky Lents." Dr. Lents first saw Plaintiff on July 29, 1990. Ultimately, Dr. Lents' treatment of Plaintiff included separate surgeries on each hand. These surgeries were performed in September and November and prevented Plaintiff from returning to work until February 1991.

On February 8, 1991, Dr. Lents released Plaintiff to return to "light duty."

Upon his return, Employer assigned Plaintiff to a "wash pit job" where he worked until the middle of March 1991. When Plaintiff reinjured his left hand, Dr. Lents told him to take off "two more weeks" and give the hand a chance to heal. When Plaintiff returned to work in March or April, he went back to "clean-up" work. On April 15, 1991, Plaintiff was called to the plant manager's office where Houchins told him that Dr. Lents had given "a full medical release, full duty, no restrictions." Plaintiff answered that he had an appointment with Dr. Lents that day, but Houchins told him he "was not going to work the sanitation job . . ., that [he] was to return to the job of tailing the Pan–O–Mat or [he] had no job at all."

As instructed, Plaintiff went to the tailing job. However, after about forty-five minutes, he "was experiencing pain." Plaintiff asked his foreman for relief so that he could speak with his doctor. After Employer found someone to take his place, Plaintiff left and went to see his lawyer, David Crader.

Attorney Crader sent Plaintiff to another physician, Dr. Charles McGinty. After Dr. McGinty examined Plaintiff, he took him off work until June 11, 1991. Dr. McGinty's letter to that effect was given to Houchins. Plaintiff testified that "I tried to go back" after June 11, 1991, but he was not allowed to return to his job. He testified that he called Employer's office repeatedly and told them he finally had a full medical release and was ready to return. As to the frequency and content of his calls, Plaintiff testified he "called at least two or three times a week . . . until September 24" and "kept them notified that I was ready and willing to come to work as soon as they told me what job and what time that I was supposed to report."

Lee Welch, a former production supervisor for Employer, confirmed that after Plaintiff sustained his injury, he did call and inquire about work. As Welch explained it, "[Plaintiff] would call and ask if I need him to work, and I would tell him no." Welch testified that he passed over Plaintiff and would not call him when work was available because of instructions given him by Houchins. Houch-ins instructed Welch not to allow Plaintiff "on the premise[s] without a written medical excuse that gave him a clean bill of health." Welch did not recall ever receiving a similar instruction about other employees who had been injured. Also, Welch testified that among Employer's management personnel and some employees, the term "John Ralph disease" was used "like a joke of not being able to use the hand."

On August 26, 1991, Plaintiff settled his workers' compensation claim. Later, when Plaintiff's continued calls to Employer about returning to work went unanswered, he "went to the bakery" on September 24 but was "stopped at the door." He was told that Gary Houchins would not allow him "on the premise[s], that [his] job had been terminated June 14." When Plaintiff called Houchins to inquire about his job, Houchins replied "I didn't fire you, Robert Renock did." Plaintiff then called Renock, who was director of employment, and asked, "What's this about my job being terminated June 14?" Renock answered, "I don't know about that. I didn't fire you. Gary Houchins did."

Ultimately, Plaintiff came to the "understanding" that he was fired on October 2, 1991. In any event, his termination was handled differently from that of other employees who were fired or disciplined. The normal procedure called for Employer to do a "write-up" when there was a problem, and if the employee disagreed with the charges, he or she "could file a grievance and contest the write-up." Such procedure was not followed when Plaintiff was fired.

The testimony of Robert Renock, called on behalf of Employer, included the following. Attorney Crader did write to Renock in "middle to late 1991" requesting that Plaintiff be put back to work. Renock did not respond, however, because Employer's insurer insisted that all communication with Plaintiff's lawyer be handled through it. Renock insisted he had nothing to do with firing Plaintiff, but acknowledged that on Plaintiff's time records there appears the written notation, "terminated 10/2/91 per Bob Renock & Gary H." When asked about this notation, Renock said it was simply "wrong." Renock

conceded that the date of Plaintiff's termination had been altered, that is, the original date was "whited out" and the date "10/2/91" was written over the white-out material. When confronted with the fact that Employer had cut off Plaintiff's hospital and health insurance before October 2, 1991, Renock's only explanation was "[t]hat would have had to have been a mistake." Renock testified that normally when an employee was terminated, he notified such employee in writing of the termination and the reasons therefor. However, neither Renock nor anyone else gave such a notice to Plaintiff.

Renock acknowledged that carpal tunnel syndrome was an industry-wide concern for bakeries in 1990 because so many of the jobs in that industry require "fast or . . . repetitive" use of the hands. Consequently, when Plaintiff's injury was diagnosed, Renock started an ergonomic assessment of jobs in the bakery. The study was never completed, however, because Plaintiff had the "only case with carpal tunnel that [Renock] could find."

In January 1994, Plaintiff filed this suit for damages, alleging that Employer's conduct in terminating his employment was discriminatory and in retaliation for his filing and pursuing his workers' compensation claim. After the jury returned a verdict of $139,800, the trial court entered judgment for that amount. This appeal followed.

## DISCUSSION AND DECISION

### Point I: Did Plaintiff Make a Submissible Case?

■ Section 287.780 [1] provides, "No employer or agent shall discharge or in any way discriminate against any employee for exercising any of his rights under this chapter. Any employee who has been discharged or discriminated against shall have a civil action for damages." In discussing this provision, our supreme court recently wrote:

> "In *Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273 (Mo.banc 1984), this Court noted that the above statute was enacted into law against the backdrop of the 'at will' doctrine, which allows an employer to fire an employee without a dura-

tional contract for any reason or for no reason at all. *Id.* at 275 n. 2. The workers' compensation act did not abolish the at will doctrine but rather provided a limited exception which allows an action where there was an exclusive causal relationship between the discharge and the employee's exercise of rights granted under chapter 287 RSMo 1978. *Id.* The Court concluded that the action authorized by the statute has four elements: (1) plaintiff's status as an employee of defendant before injury, (2) plaintiff's exercise of a right granted by chapter 287, (3) employer's discharge of or discrimination against plaintiff, and (4) an exclusive causal relationship between plaintiff's action and defendant's actions. *Id.* at 275."

*Crabtree v. Bugby*, 967 S.W.2d 66, 70[1] (Mo. banc 1998).

With the foregoing principles to guide us, we turn to Employer's first point which we set forth verbatim.

> "The trial court erred in denying [Employer's] motion for judgment notwithstanding the verdict because [*Plaintiff*] *was terminated from his employment for failing to return to work without a valid excuse for being off work and* [*Plaintiff*] *refused to return to his work unless he could be put into a job that accommodated his work restrictions,* each legal reasons for [Employer] to terminate [Plaintiff], and therefore, [Employer] did not discriminate against [Plaintiff] for exercising his rights under the Missouri Workers['] Compensation law and [Plaintiff's] evidence failed to show that [Employer] terminated [Plaintiff] as a direct and exclusive result of [Plaintiff's] exercising his rights under said law." (italics added).

■ Preliminarily, we agree with Employer's argument that it can fire an employee without incurring liability under § 287.780 "when the employee has recovered from his or her injuries and is declared able to return to work, but cannot and will not perform the duties required by the job." *See Felts v. Ford Motor Co.*, 916 S.W.2d 798, 803[10] (Mo.App.1995). It is also clear that the mere

---

**1.** All statutory references are to RSMo 1994 un-   less otherwise indicated.

filing of a claim and subsequent discharge for absenteeism creates no cause of action under § 287.780. However, these principles do not aid Employer. This follows because Employer's claims as to *why* it fired Plaintiff as set forth in the italicized portion of its point are simply not supported by the record.

At trial, the only direct evidence of Employer's reason for firing Plaintiff was that he "failed to call in or report to work for three consecutive days." Robert Renock, director of safety and employment, testified that Employer had a "three day no call" rule, meaning that absence from work for three successive days without "proper notification" could result in termination. Renock also testified that article 5, section 6 of the union contract was the source of the "three day, no call" termination rule. However, Renock acknowledged that such contract clause *does not* provide for "termination" for three days' absence without notification. Rather, the contract only provides that an employee's seniority "will be considered broken in the event of ... absence from work for three consecutive work days without proper notification."

The phrase "proper notification" is undefined in the union contract. However, there is substantial evidence from which the jury could reasonably have inferred that "proper notification" simply meant that an employee was to let Employer know of his or her intention to miss work in time for Employer to call in a replacement. Based on Employer's evidence, Plaintiff's termination had nothing to do with lack of "*a valid excuse for being off work*" as Employer now claims; rather, it was for violation of the "three day no call" rule.

Likewise, the record fails to support Employer's second assertion of why Plaintiff was fired. When Renock was asked if violation of the "three day no call" rule was the only reason Plaintiff was fired, he answered "Yes, sir." His testimony continued thusly:

"Q. Well, then it didn't matter whether or not he could do the job, did it?

"A. No, that didn't enter into it."

In this fashion, Employer established that it did not fire Plaintiff because he could no longer tail the Pan–O–Mat machine.

■ The question remains, however, whether all the elements of a cause of action for retaliatory discharge under § 287.780 are supported by substantial evidence. "Appeals from trial court denials of motions for judgment notwithstanding verdict are treated in the same fashion as appeals from denial of motions for directed verdicts at the close of the evidence. In both instances, the primary question is, did plaintiff make a submissible case?" *Norris v. Jones*, 687 S.W.2d 280, 281[1] (Mo.App.1985). *See Wiedower v. ACF Indust.*, 763 S.W.2d 333, 337 (Mo.App.1988). In resolving this question, we examine the evidence in a light most favorable to Plaintiff and accept such evidence as true, giving Plaintiff the benefit of all favorable inferences that may reasonably be drawn from the evidence, and disregard Employer's evidence except as it aids Plaintiff's case. *Hansome*, 679 S.W.2d at 274[1].[2] Proof that an employee was discharged solely because he or she exercised some "right" under the Workers' Compensation Act is necessarily indirectly made because ordinarily an employer is not going to announce retaliation as its motive. *Reed v. Sale Mem'l Hosp. and Clinic*, 698 S.W.2d 931, 935 (Mo.App.1985).

Here, there was evidence from which the jury could reasonably infer that Employer had a prohibited retaliatory motive for firing Plaintiff. Although carpal tunnel syndrome was known to be a potential problem in the baking industry, when Plaintiff first presented Dr. Tellow's report to Houchins and told him that he wanted to file a "workers' comp claim," Houchins responded by saying he did not believe the job caused Plaintiff's injuries. Houchins suggested instead that Plaintiff's injuries stemmed from riding his motorcycle and that he should present a claim to his health insurance carrier. There is evidence that Employer then delayed filing a report of injury form concerning Plaintiff's injuries un-

**2.** This court's recital of evidence under the "facts" section of this opinion adheres to this rule. We have omitted from our summary the ample evidence that could support a finding that proscribed retaliation was not Employer's motive for firing Plaintiff. Apparently the jury did not believe such evidence, which was its prerogative.

til Plaintiff complained to the Division of Workers' Compensation about the absence of such report. Evidence indicates that carpal tunnel injuries were of sufficient concern to Employer that it commenced ergonomic evaluation of its jobs after Plaintiff was diagnosed with the problem. The study was discontinued however, after Employer found that Plaintiff was the only employee claiming this type of injury. Among fellow employees and some management personnel, hand injuries came to be derisively referred to as the "John Ralph" disease. Houchins instructed Welch not to allow Plaintiff in the bakery "without a written medical excuse that gave him a clean bill of health," a practice previously unknown to Welch. In contrast, other employees with wrist injuries were routinely put on light duty. There is also evidence that after Dr. McGinty released Plaintiff to return to work in mid-June 1991, Plaintiff made repeated efforts and offers to return to work but such efforts were routinely ignored or rejected by Employer. From the foregoing, the jury could reasonably have inferred that Employer resented Plaintiff's pursuit of his claim and was fearful that other employees might file similar claims unless Employer made an example of Plaintiff.

Added strength for such inferences can be found in the following evidence. Both Renock and Houchins denied responsibility for firing Plaintiff, yet Employer's records revealed both were implicated. Ordinarily, fired employees are notified of the reason, but that did not happen when Plaintiff was fired. Employer insisted at trial that Plaintiff was fired because of the "three day, no notice" rule, a rule that was based on a clause in the union contract. However, examination of that contract reveals that the penalty prescribed for violating this rule was loss of seniority, not discharge from employment. Moreover, Employer's position at trial was that Plaintiff continuously violated the "three day, no notice" rule from June through October 1991, yet it never invoked this so-called rule until after Plaintiff settled his workers' compensation claim. From this evidence, the jury could reasonably have inferred that the "three day, no notice" reason for firing Plaintiff was pretextual.

■ Another factor to consider when looking at Employer's motive is the proximity in time between the exercise of the right and the time of the firing. *Reed*, 698 S.W.2d at 935[4]. Here, Plaintiff first learned of his discharge on September 24, 1991, when he was told he could not enter the bakery. This occurred approximately four weeks after Plaintiff settled his workers' compensation claim. During the September 24 incident, Plaintiff was told he had been fired on June 14. Later, however, Plaintiff learned that payroll records showed his termination date as October 2, 1991, yet even that record had been altered. From this type evidence, the jury could have inferred that Employer chose a discharge date further from when Plaintiff filed and settled his claim and, in this fashion, tried to avoid the appearance of retaliatory firing.

In summary, even allowing for the elusiveness of proof of retaliatory intent, Plaintiff presented evidence from which a reasonable juror could conclude that Employer discriminated against and fired him solely because he had filed a workers' compensation claim. The trial court properly denied the motion for judgment notwithstanding the verdict. Plaintiff's first point is denied.

***Point II: New Trial Due To Alleged Excessive Damage Award***

■ Employer's second point maintains that the trial court erred when it denied Employer's motion for new trial based on its claim that the jury's verdict was excessive. The genesis of this argument is Plaintiff's testimony that the Social Security Administration adjudged him "permanently totally disabled as of August, 1994, from a neck injury." Employer insists that since Plaintiff's neck problem and resulting disability were unrelated to his former job with Employer, he could not have suffered lost wages and benefits after August 1994 because of Employer's misconduct. This follows, Employer says, because Plaintiff "was unable to engage in any substantial work thereafter."

■ The foregoing argument proceeds on the apparent assumptions that (1) the jury knew without being instructed what criteria Plaintiff had to meet in order to show himself entitled to disability social security benefits,

and (2) Missouri courts are compelled to recognize, accept, and apply an adjudication of total disability made by the Social Security Administration. Neither premise is valid. Written instructions are the only means to inform the jury of the law and that their decisions must be based on that law. MAI 5th at XLV (1996). Also, it is settled that a social security determination is not binding on Missouri courts, especially where, as here, the determination was more than four years before trial. *See In re Marriage of Liljedahl*, 942 S.W.2d 919, 925[11] (Mo.App.1996).

Moreover, a complaint that a jury verdict is excessive, standing alone, does not entitle a defendant to appellate relief. *Elfrink v. Burlington Northern R.R. Co.*, 845 S.W.2d 607, 614[16] (Mo.App.1992). A defendant must show that the excessive verdict in fact stemmed from bias and prejudice by showing that the verdict was "glaringly unwarranted" by the evidence and that some trial error or misconduct by the plaintiff was responsible for prejudicing the jury against the defendant. *Id.* If a defendant can establish bias and prejudice, then the jury is guilty of misconduct which vitiates the entire verdict. *Id.* at 614[17]. Under such circumstances, a reviewing court can reverse and remand for a new trial. *Id.*

Like the appellant in *Elfrink*, here Employer makes no claim of bias or prejudice on the part of the jury; accordingly, its argument does not support appellate relief. *Id.* at 614. Point II is denied.

### Point III: Did The Trial Court Err In Denying Remittitur Motion?

Employer's third point makes the alternative assertion that the trial court erred when it failed to grant Employer's motion for remittitur. Employer argues that remittitur was mandated because the only "fair and reasonable compensation" for Plaintiff would have excluded wages and lost insurance benefits after August 1994 when the Social Security Administration adjudged him disabled according to that agency's standards.

Remittitur is authorized by § 537.068, the pertinent part of which provides:

"A court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the

jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages."

Review of a trial court's action regarding a remittitur request is undertaken with these principles in mind. The amount of a damage award is, under proper instructions, a matter resting within the sound discretion of the jury. *See Coghlan v. Trumbo*, 179 S.W.2d 705, 706[4] (Mo.1944); *King v. Unidynamics Corp.*, 943 S.W.2d 262, 268[17] (Mo.App.1997). A trial court has broad discretion when considering the entry of a remittitur order and "its decision whether or not to reduce damages will not be disturbed on appeal absent an abuse of discretion so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion." *King*, 943 S.W.2d at 268[18]. Appellate courts exercise their power to interfere with the judgment of the jury and trial judge with caution, and then only where the verdict is manifestly unjust. *Id.* at 268[19].

Here, Employer cites three cases to support its argument that Plaintiff was not entitled as a matter of law to recover damages from Employer after August 1994; *Winbush v. State of Iowa, by Glenwood State Hospital*, 66 F.3d 1471 (8th Cir.1995) (alleged discriminatory hiring practices in violation of Title VII, 42 U.S.C. § 2000(e)); *August v. Offices Unlimited, Inc.*, 981 F.2d 576 (1st Cir.1992) (alleged wrongful discharge on the basis of handicap in violation of Massachusetts statute); and *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768 (8th Cir.1987) (alleged violation of federal Rehabilitation Act, 29 U.S.C. § 794). Summarized, these cases stand for the proposition that a victim of proscribed discriminatory employment practices cannot recover damages if a disability unrelated to the victim's employment precluded him or her from working.

Without deciding whether the foregoing cases enunciate principles that should apply to a retaliatory discharge case under § 287.780, it is sufficient to say that the jury was never instructed that this was the law in Missouri. The relevant portion of the damage instruction (No. 8) given to this jury reads:

"If you find in favor of plaintiff under [the verdict directing instruction] then you must award plaintiff such sum as you find by the preponderance of the evidence and fairly and justly compensate plaintiff for any damages you find plaintiff sustained as a direct result of [Employer's] discharge.

"Plaintiff's claim for damages includes two distinct types of damages and you must consider them separately.

. "First, you must determine the amount of any wages and fringe benefits plaintiff would have earned in his employment with [Employer] if he had not been discharged on October 2, 1991 through the date of your verdict, minus the amount of other income from employment or other sources replacing employment during that time."

Employer never objected to this instruction as being a misstatement of law, nor did it offer a limiting instruction or withdrawal instruction.[3] Suffice it to say that if the principles enunciated in *Winbush, August,* and *Beauford* entitled Employer to a limiting or withdrawal instruction, then it was Employer's duty to draft and request such an instruction once there was evidence of Plaintiff's disability beginning in August 1994. *See Chaussard v. Kansas City Southern R.R. Co.,* 536 S.W.2d 822, 827[5] (Mo.App.1976). Considering the instruction given to this jury, we cannot convict it of a "simple mistake in weighing the evidence" that resulted "in awarding disproportionate damage." *See Elfrink,* 845 S.W.2d at 614[18]. This court will not, under the guise of a remittitur request, convict a jury of a gross abuse of discretion in its damage award when, as here, ample evidence exists to support the verdict based on the instruction given. Point III is denied.

The judgment is affirmed.

MONTGOMERY and BARNEY, JJ., concur.

---

3. The verdict amount shows that the jury followed this instruction and Employer does not contend otherwise. Specifically, the verdict reveals that the jury deducted the social security amounts and employment earnings received by Plaintiff between October 2, 1991, and the date of the verdict.